374-08/WLJ
FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiffs
CONTI CRISTALLO SCHIFFAHRTS-GMBH & Co. KG
MS CONTI SYDNEY and CONTI CRISTALLO
SCHIFFAHRTS-GMBH & Co. KG MS CONTI
BARCELONA
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

William L. Juska (WJ 0772)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CONTI CRISTALLO SCHIFFAHRTS-GMBH & Co. KG
MS CONTI SYDNEY and CONTI CRISTALLO
SCHIFFAHRTS-GMBH & Co. KG MS CONTI
BARCELONA,

                                        Plaintiffs,

        - against –

SHANDONG YANTAI INTERNATIONAL MARINE
SHIPPING CO., a/k/a SHANDONG PROVINCE
YANTAI INTERNATIONAL MARINE SHIPPING CO.,

                                        Defendant.
------------------------------------------------------------x



**AMENDED**
**VERIFIED COMPLAINT**

        Plaintiffs CONTI CRISTALLO SCHIFFAHRTS-GMBH & Co. KG MS CONTI

SYDNEY (hereinafter "CCS MS CONTI SYDNEY") and CONTI CRISTALLO

SCHIFFAHRTS-GMBH & Co. KG MS CONTI BARCELONA (hereinafter "CCS MS CONTI

BARCELONA") (and hereinafter collectively "Plaintiffs"), by their attorneys Freehill, Hogan &

Mahar, LLP, as and for its Amended Verified Complaint against Defendant SHANDONG

YANTAI INTERNATIONAL MARINE SHIPPING  CO., a/k/a SHANDONG PROVINCE

YANTAI INTERNATIONAL MARINE SHIPPING CO. (hereinafter "SYMS"), alleges upon information and belief as follows:

1.  This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves claims for the breach of maritime contracts of charter party.   This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333.  Jurisdiction is also proper pursuant to the Court's federal question jurisdiction pursuant to 28 U.S.C. §1331.   Federal jurisdiction also exists because the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.  At all times relevant hereto, Plaintiffs were and still are foreign business entities duly organized and existing under the laws of a foreign country with an address at Wernher-von-Braun-Strasse 10, 85640 Putzbrunn, Germany.

3.  At all times relevant hereto, Defendant SYMS was and still is a foreign business entity existing under the laws of China with an office and place of business at No. 2 Huanhai Road, Yantai, Shandong, 264000, China.

4.  CCS MS CONTI SYDNEY, as the owner of the M/V CONTI SYDNEY, entered into a maritime contract of charter party with SYMS as charterer, under a New York Produce Exchange form of time charter dated May 23, 2005 (the "M/V CONTI SYDNEY Charter") for a period of 48 months months, plus 45 days / minus 30 days, exact period at the charterer's option. A copy of the Charter is annexed hereto as Exhibit A.

5.  Under Clause 4 of the M/V CONTI SYDNEY Charter SYMS is obligated to pay daily hire in the amount of $26,000.00, payable every 15 days in advance.

6.    SYMS paid hire through May 8, 2008 but, despite due demands from CCS MS CONTI SYDNEY, has paid no hire since that date. For the period from May 9, 2008 to July 8, SYMS owes **$1,521,000.00** in hire.

7.    In addition, SYMS has failed to pay other amounts due under the M.V CONTI SYDNEY Charter totaling **$90,238.56,** as set forth in CCS MS CONTI SYDNEY's summary of Unsettled Owners; Invoices, attached at Exhibit B.

8.    The Charter between CCS MS CONTI SYDNEY and SYMS provides for disputes to be resolved by arbitration at Hong Kong, with English law to apply.  *See* Exhibit A, Clause 51. CCS MS CONTI SYDNEY reserves its right to arbitration.

9.    CCS MS CONTI SYDNEY has satisfied all of its obligations under the M.V CONTI SYDNEY Charter with SYMS.

10.    CCS MS CONTI BARCELONA, as the owner of the M/V CONTI BARCELONA, entered into a maritime contract of charter party with SYMS as charterer, under a New York Produce Exchange form of time charter sated May 23, 2005 (the "M/V CONTI BARCELONA Charter") for a period of 48 months, plus 45 days / minus 30 days, exact period at the charterer's option. A copy of the Charter is annexed hereto as Exhibit C.

11.    Under Clause 4 of the M/V CONTI BARCELONA Charter SYMS is obligated to pay daily hire in the amount of $26,000.00, payable every 15 days in advance.

12.    SYMS paid hire through May 7, 2008 but, despite due demands from CCS MS CONTI BARCELONA, has paid no hire since that date. For the period from May 8, 2008 to July 7,  SYMS owes **$1,521,000.00** in hire.

13. In addition, SYMS has failed to pay other amounts due under the MS CONTI BARCELONA Charter totaling **$56,876.09,** as set forth in CCS MS CONTI BARCELONA's summary of Unsettled Owners; Invoices, attached at Exhibit D.

14. The Charter between CCS MS CONTI BARCELONA and SYMS provides for disputes to be resolved by arbitration at Hong Kong, with English law to apply. *See* Exhibit D, Clause 51. CCS MS CONTI BARCELONA reserves its right to arbitration.

15. In all, SYMS owes the Plaintiffs for damages for breach of their respective Charters the aggregate amount of **$3,189,114.65,** no part of which has been paid, though duly demanded.

16 Plaintiffs expressly reserve all rights under the Time Charter Parties, including, but not limited to, arbitration of disputes, and nothing herein constitutes a waiver of any of Plaintiffs' rights thereunder, nor Plaintiffs' right to amend their damage calculations as the matter progresses through the balance of the periods of the charters.

17. This action is brought *inter alia* pursuant to 9 U.S.C. §8 in order to obtain security for Plaintiffs' claims made or to be made in arbitration in Hong Kong under English law, as agreed by the parties.

18. As a regular feature of English law and Hong Kong arbitration, attorneys fees are awarded to the successful litigant, along with costs, disbursements and the cost of the arbitration, all of which constitutes a part of the Plaintiffs' claims and the amounts sued for herein.

19. The Plaintiffs estimate that they will incur approximately **$150,000.00** in awardable attorneys fees, disbursements, and costs of the arbitration.

20. Interest is also typically awarded under English law and Hong Kong arbitration, at the rate of approximately 7.0% compounded quarterly. The Plaintiffs estimate that the arbitrations under the M/V CONTI SYDNEY Charter and under the M/V CONTI

BARCELONA Charter will be resolved in approximately thirty months.    Accordingly, the Plaintiffs calculate that they will be awarded approximately **$604,160.20** in interest, which also constitutes a part of the Plaintiffs' claims and the amounts sued for herein.

21.    In all, the claims for which Plaintiffs sue in this action, as near as presently may be estimated, total **$3,943,274.85**, no part of which has been paid by SYMS.

22.    Upon information and belief, and after investigation, Defendant SYMS cannot be "found" within this district for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due to, from, or for the benefit of Defendant SYMS (hereinafter, "ASSETS"), including but not limited to "ASSETS" at, being transferred through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Amended Process of Maritime Attachment and Garnishment issued herein.

**WHEREFORE**, Plaintiffs pray:

a.    That process in due form of law according to the practice of this Court issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged, failing which a default will be taken against it in the principal amount of **$3,189,114.65** plus interest, costs and attorneys fees;

b.    That since Defendant cannot be found within this District pursuant to Supplemental Rule B, all tangible or intangible property of the Defendant, up to and including the sum of **$3,943,274.85**, be restrained and attached, including but

not limited to any cash, funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or any other property of, belonging to, due to, from, or for the benefit of Defendant (collectively "ASSETS"), including but not limited to such "ASSETS" as may be held, received or transferred in its own name or as may be held, received or transferred for its benefit at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Amended Process of Maritime Attachment and Garnishment issued herein; and

c.    That this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary; and,

d.    For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
        July 11, 2008

> FREEHILL HOGAN & MAHAR, LLP
> Attorneys for Plaintiffs
> CONTI CRISTALLO SCHIFFAHRTS-GMBH & Co. KG
> MS CONTI SYDNEY and CONTI CRISTALLO
> SCHIFFAHRTS-GMBH & Co. KG MS CONTI
> BARCELONA,
>
> By: _____
>      William L. Juska (WJ 0772)
>      80 Pine Street
>      New York, NY  10005
>      (212) 425-1900
>      (212) 425-1901 fax

## ATTORNEY VERIFICATION

State of New York      )
                       ) ss.:
County of New York  )

WILLIAM L. JUSKA, being duly sworn, deposes and says as follows:

1.      I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiffs in this action, I have read the foregoing Amended Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by our clients.

3.      The reason this verification is made by an attorney and not by the Plaintiffs is because the Plaintiffs are foreign entities, none of whose officers are presently within this Judicial District.

_____
William L. Juska

Sworn to before me this
11th day of July, 2008

_____
Notary Public

PETER J. McCARTHY
Notary Public, State of New York
No. 01MC4884235, Qualified in Kings County
Certificate Filed in New York County
Commission Expires August 1, 2009

Exh. A



SECOND ORIGINAL

### *Time Charter*

Government Form

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  THIS CHARTER PARTY, made and concluded in ...BJG, 23rd ..... day of ...May.................................................19.... 2005
2  Between.......................Conti Cristallo Schiffahrts-GmbH & Co.KG MS 'CONTI SYDNEY', Purbrunn/Germany.......................
3  Owners of the good ..............(Steamship)(Motorship) ...... MV 'CONTI SYDNEY' - descriptions See Clause 83 ........ of ........
4  of ....................tons gross register, and ....................tons net register, having engines of..............................indicated horse power
5  and with hull, machinery and equipment in a thoroughly efficient state, and classed...............................
6  at...................of about ....................cubic feet basic capacity, and about.......................................tons of 2240 lbs.
7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity;
8  allowing a minimum of fifty tons) on a draft of......feet......inches on.....................summer freeboard, inclusive of permanent bunkers,
9  which are of the capacity of about.......................tons of fuel, and capable of steaming, fully laden, under good weather
10  conditions about....................knots on a consumption of about.......................tons of best Welsh coal best grade fuel oil best grade Diesel oil;
11  now...... trading ...........................................................................................
12  ....................and......Messrs. S.Y.M.S.(Shandong Yantai International Marine Shipping Co.)...Charterers of the City of........Shandong, PR China........
13  WITNESSETH, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14  about...........a time charter period of 48 months plus 45 days / minus 30 days, exact period in Charterers' option.................................
15  ..............................................................................................within below mentioned trading limits.
16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter subject to Owners approval and giving reason if
    *disagree within 48 hours when Owners receive notice of sublet from Charterers*, but Charterers remaining responsible for
17  the fulfilment of this Charter Party. Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligation hereunder.
18  Vessel to be placed at the disposal of the Charterers, *at on arrival at first sea pilot station of Hong Kong* any time day and night Sundays and Holidays
19  included. Owners shall give Charterers notice of vessel's delivery date in accordance with Clause 36.....................................
20  in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No.6), as
21  the Charterers may direct. If such dock, wharf, or place be not available time to count as provided for in clause No.5. Vessel on her delivery *shall* to be
22  ready to receive cargo *in I.S.O. containers and/or flat racks with dry and with* clean-swept holds and tight, staunch, strong and in every way fitted for
    *the container liner* service, having water ballast, winches and
23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24  time (and with full complement of officers, and crew, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful,
    *harmless* merchan-
25  dise, including petroleum or its products, in proper containers, excluding *see Clause 54*....................
26  (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,
27  all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North
28  America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or
29  Mexico, and/or South America...................................................................and/or Europe
30  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between
31  October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding, when out of season, White Sea, Black Sea and the Baltic,
32  *in world wide trading always via safe port(s), safe berth(s), always afloat, always accessible and always within*
33  *Institute Warranty Limits with lawful merchandise in ISO containers only (Charterers present trading intention: Far East/South East*
34  *Asia)*.......................... See Clause 86......................................................................................
35  as the Charterers or their Agents shall direct, on the following conditions:
36  1. That the Owners shall provide and pay for all provisions, wages *and immigration* consular shipping and discharging fees of the Crew; shall pay
    for the
37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
38  the vessel in a thoroughly efficient state in hull, machinery and equipment *with all certificates for the vessel and officers/crew necessary to comply with*
    *current regulations at port(s) of call and canals* for and during the service.
39  2. That the Charterers *while the vessel is on hire* shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages,
    *compulsory garbage/sludge fees unless vessel has actually disposed of garbage/sludge in which case for Owners' account, sludge removal to be for*
    *Owners account provided that vessel calls PRC ports and/or Busan on a regular basis during currency of this charter period, otherwise costs to be*
    *mutually shared between Owners and Charterers. However in case of compulsory port, to be for Charterers account*, towages, Agencies, Commissions,
40  Consular Charges (except those pertaining to *individual the Crew members but not for usual clearance charge which is considered as part of port*
    *charges, or flag of the vessel*), and all other usual expenses except those before stated in Clause 1, but when the vessel puts into
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43  charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
44  of six months or more.
45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46  owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47  for dunnage, they making good any damage thereto.
48  3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
49  board the vessel at the current prices in the respective ports; the vessel to be delivered with not less than....................tons and not more than
50  ....................tons and to be re-delivered with not less than....................tons and not more than....................tons: See Clause 37
51  4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of USD 26,000.00 *per day or pro rata including overtime*
52  payable every 15 days in advance.........................United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and
53  stores on,....................summer freeboard, per Calendar Month, commencing on and from the *time of the* day of her delivery, as aforesaid, and at



**SECOND ORIGINAL**

54   and after the same rate for any part of a *day month*; hire to continue until the hour of the day of her re-delivery in like good order and condition,
ordinary

55   wear and tear excepted, to the Owners (unless, *the vessel lost*) at *on dropping last outbound sea pilot at one(1) safe port Colombo or in Charterers option Port Kelang/Singapore/South Japan range, port in Charterers option, at any time day and night*

56   *Sundays Holidays included*, unless otherwise mutually agreed. Charterers are to give Owners not less than *45/30/15/10/5* days approximate notice of *redelivery, followed by 3/2/1 days definite*

57   notice of vessel's expected date of re-delivery, and probable port. *Delivery and redelivery date/time to be based on Shanghai time.*

58   5. Payment of said hire to be made in New York in cash in United States Currency, *semi-monthly every 15 days in advance against Charterers' receipt of Owners' correct original invoices*, and for the last half month or

59   part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60   due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61   hire, or bank guarantee, or on any breach of this Charter Party, *subject to Clause 41*, the Owners shall be at liberty to withdraw *any part of the service or* the vessel from the service of the Char-

62   terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from *the date and hour of valid delivery of the Vessel to Charterers* 7 a.m. on the working day

63   following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they

64   to have the privilege of using vessel at once, such time used to count as hire.

65   Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, *up to a maximum US$1000. In case higher amount(s) are involved, Charterers to firstly consult Owners* by the Charterers or their Agents, subject

66   to 2½ % commission and such advances shall be deducted from the hire *against presentation of vouchers stamped/signed by Master and/or officers.* The Charterers, however, shall in no way be responsible for the application

67   of such advances *(see also Clause 55).*

68   6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place *or anchorage* that Charterers or their Agents may

69   direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely

70   lie aground.

71   7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72   accommodations for Supercargo, if carried, shall be at the Charterer's disposal, reserving only proper and sufficient space for Ship's officers, crew,

73   tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers

74   paying Owners ............per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are

75   incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.

76   8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77   boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78   agency; and Charterers are to *perform all cargo handling load, stow,* and trim the cargo at their expense under the supervision of the Captain; who is to sign *the* Bills of Lading for

79   cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *However in Charterers' option, the Charterers or their agents may sign Bills of Lading on behalf of the Captain always in conformity with Mate's or tally/clerk's receipts. All Bills of Lading shall be without prejudice to this Charter and the Charterers shall indemnify the Owners against all consequences or liabilities which may arise from any inconsistency between this Charter and any Bills of Lading or waybills signed by the Charterers or their agents or by the Captain at their request.*

80   9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81   receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82   10. That the Charterers *are entitled* shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83   with the utmost despatch *(See also Clause 79.-Supercargo).* He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84   rate of US$15 $1.00 per day *for victualling at Captain's table.* Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85   Clerks, Stevedore's Foreman, etc., Charterers paying at the *for all such victualling, representation and communications at actual costs against representation detailed vouchers* current rate per meal, for all such victualling. *Rate per meal USD 5.00. Charterers to provide Master in writing with their instructions as to any required entertainment/communication/victualling.*

86   11. That the Charterers shall furnish the Captain *or Vessel's command or Owners prior to commencement of voyage or* from time to time with all requisite instructions and sailing directions, in writing, *or by Cable/Telex/Fax/Email* and the

87   Captain shall keep a full and correct *deck and engine* Log of the voyage or voyages *in English language*, which are to be patent and *accessible* to the Charterers or their Agents, and furnish the Char-

88   terers, their Agents or Supercargo, when required, with a true *clear and legible* copy of such deck and engine *daily* Logs *in English language*, showing the course of the vessel, *weather conditions*, Beaufort scale and sea state, speed, revolutions of main engine per minute, and distance run and the con-

89   sumption of fuel *for main engine, generous and/or auxiliary engines.*

90   12. That the Captain shall use diligence in caring for the ventilation of the cargo/*container.*

91   13. That the Charterers shall have the option of continuing this charter for a further period of.................................................................

92   ..............................................................................................................................................................................................................

93   on giving written notice thereof to the Owners or their Agents........days previous to the expiration of the first-named term, or any declared option.

94   14. That if required by Charterers, time not to commence before *the agreed opening layday (See Clause 36)*..........and should vessel

95   not have given written notice of readiness *be delivered* on or before the *agreed cancelling date stipulated in Clause 36, the Owners immediately after having got knowledge of it to inform Charterers in writing about the reasons and the right and true situation of the vessel, giving Charterers proof of same, respectively enabling Charterers to check such situation themselves, in the same message Owners to apply for a reasonable extension of the agreed cancelling date in line with the prevailing circumstances, and Charterers to declare within 2 working days whether they agree to extend the cancelling date accordingly, or whether they elect to cancel the contract.* but not later than 4 p.m. Charterers or

96   their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

97   15. That in the event of the loss of time from deficiency *and/or default of and/or strike or stoppage by officers or crew or deficiency* of men or stores, fire, breakdown *of* or damages to hull, machinery or equipment,



**SECOND ORIGINAL**

98  grounding, detention by average accidents to ship or cargo, *unless resulting from inherent vice, quality or defect of the cargo,* drydocking for the purpose
of examination or painting bottom, or by any other cause *unless caused by Charterers or Charterers' agents/servants or any reasons for which Charterers
are responsible.*

99  preventing the full working of the vessel, the payment of hire *and overtime if any,* shall cease for the time thereby lost; *All fuels used by the vessel while
off-hire shall be for Owners' account* and if upon the voyage the speed be reduced by

100  defect in or breakdown of any part of her hull, machinery or equipment, the time *actually* so lost, and the cost of any extra fuel consumed in
consequence

101  thereof, and all extra *proven direct resulting* expenses shall be deducted from the hire.

102  16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103  returned to the Charterers at once. That of the Act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106  purpose of saving life and property.

107  ~~17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,~~
108  ~~one to be appointed by each of the parties hereto, and the third by the two so chosen, their decision or that of any two of them, shall be final, and for~~
109  ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~ *(See Clause 51)*

110  18. That the Owners shall have a lien upon all cargoes, and all sub-freights, *sub-hires* for any amounts due under this Charter, including General Aver-
111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113  might have priority over the title and interest of the owners in the vessel. *(See Clause 104 - BIMCO Non-Lien Provision Clause)*

114  19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115  Crew's proportion. General Average to be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
116  York-Antwerp Rules 1974 ~~1924,~~ *and any subsequent latest amendments thereto, in Hong Kong, - hire not to contribute to General Average* ~~at such
port or place in the United States as may be selected by the carrier, and as to matters not provided for by these~~
117  ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118  ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119  ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120  ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121  ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122  ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123  ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124  ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125  ~~United States money.~~ *Charterers shall procure that all Bills of Lading issued during the currency of the Charter will contain a provision to the effect
that general averages shall be adjusted according to York-Antwerp Rules 1974 including latest subsequent amendments and will include the "New
Jason Clause" - as attached to this Charter Party.*

126  ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127  ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128  ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129  ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130  ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131  ~~ships belonged to strangers.~~

132  ~~Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.~~

133  ~~20. Fuel used by the vessel while off-hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the~~
134  ~~cost of replacing same, to be allowed by Owners.~~

135  ~~21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136  ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137  ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138  *See Clause 99.....................................................................................................................*
139  ...................................................................................................................................................

140  ~~22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~
141  ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142  ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for~~
143  ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The~~
144  ~~Charterers to have the use of any gear on board the vessel.~~ *If required the vessel shall work night and day.*

145  ~~23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging,~~
146  ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147  ~~dock hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148  ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149  ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150  ~~thereby.~~

151  ~~24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152  ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153  ~~etc.", in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154  ~~of which are to be included in all bills of lading issued hereunder.~~

155  ~~U.S.A. Clause Paramount~~



**SECOND ORIGINAL**

156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
160 ~~Both-to-Blame Collision Clause~~
161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~
167 ~~25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-~~
168 ~~drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the~~
169 ~~port or to get out after having completed loading or discharging. See Clause 60 - BIMCO Linertime Ice Clause~~
170    26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, *physical control and operation of the vessel and at all times acts of pilots and tug boats,* insurance, crew, and all other matters,
same as when trading for their own account.
172    27. A commission of *1.25 2½* per cent is payable by the Vessel and Owners to *Reklub Shipping Limited*..............................................
173 ...................................................................................................................................................................................................
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175    28. An address commission of 2½ per cent payable to...................*Charterers*................................on the hire earned and paid under this Charter.

*Additional Clauses Number 29 to 115 inclusive and General Average and New Jason Clause, General Clause Paramount and New Both to Blame*
*Collision Clause, as attached hereto, are deemed to be fully incorporated in this Charter Party.*

Charterers: ..........................

Owners: ..........................

Copd Cristallo Schiffahrts GmbH & Co. KG
MS "Copd Sydney"
Werner-von-Braun-Str. 10 · 85640 Putzbrunn
Tel. 0 89/45 65 50-0 | Fax 0 89/45 65 50-55

This is a computer generated copy of the TIME CHARTER GOVERNMENT FORM (Revised 3rd October, 1946) approved by the New York Produce Exchange (NYPE). Any insertion or deletion to the form must be clearly
visible. In the event of any modification made to the preprinted text of this document, and which is not clearly visible, then the original NYPE approved document shall apply. The brokers assume no responsibility for any loss
or damage caused as a result of discrepancies between the original NYPE approved document and this document.

SECOND ORIGINAL



REKLUB

### RIDER CLAUSES TO M/V "CONTI SYDNEY"
### SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
### CHARTER PARTY DATED MAY 23RD, 2005

**29. Inspection / Certificate at Calling Ports**

Vessel's equipment shall comply with the regulations of the countries in which Vessel will be employed and Owners are to ensure that Vessel is at all times in possession of valid and up-to-date certificates of efficiency to comply with such regulations.

Owners are obliged to deliver and keep the Vessel, her crew and anything pertaining hereto supplied with up to date and complete certificates and approvals and equipment and fittings, enabling Vessel and her crew to load, carry and discharge all cargoes permitted under this Charter Party, and to receive bunkers within the trading limits of this Charter-Party. For oil pollution certificates, Clause 35 to apply.

If stevedores, longshoremen or other workmen are not permitted to work due to failure of Master and/or Owners and/or Owners' Agents to comply with regulations, or because Vessel is not in possession of such valid and up-to-date certificates of efficiency, then Charterers may suspend hire for the time thereby lost and Owners to pay all proven direct resulting extra expenses incurred incidental to and resulting from such failure.

Vessel to comply with the Safety and Health Regulations and all current requirements at all ports of call during the currency of this Charter and it is the responsibility of the Master and Owners to arrange for required vaccination/s and to keep onboard corresponding certificates.

**30. Labour Boycott**

In the event of loss of time due to blockade or boycott of the Vessel at any port or place arising from terms and conditions on which members of crew are employed, payment of hire shall cease for the time thereby lost, and Owners to pay all direct/proven expenses incurred incidentally due to and resulting from such blockage or boycott. Owners warrant that to their best knowledge the Vessel is not blacklisted by any country within the trading limits of this Charter Party.

**31. Vessel's Light for Night Work**

Vessel to provide and maintain free of expense to Charterers sufficient and efficient light, as on board, to permit simultaneous cargo works at night at all hatches at the same time unless electrical clusters from shore are compulsory in which case same to be for Charterers' account.

**32. Ballast Voyages**

Owners guarantee that Vessel can safely undertake voyages in ballast without carrying solid ballast, but with fuel and water ballast only.

**33. Fumigation - Cargo Gear - Putting Back - Off Hire Bunkers - Crane Breakdown - Strike/Arrest**

a) **Fumigation-Deratization**



SECOND ORIGINAL



REKLUB

### RIDER CLAUSES TO M/V "CONTI SYDNEY"
### SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
### CHARTER PARTY DATED MAY 23RD, 2005

Vessel to be delivered with valid deratization exemption certificate on board and if such does not cover the whole period on time charter and fumigation and/or deratization is necessary, cost of same and detention to be for Owners' account.

**b) Cargo Gear Certificate**

Vessels cargo gear and all other equipment shall comply with the regulations of the countries in which Vessel will be employed and Owners are to ensure that Vessel is at all times in possession of all valid and up-to-date certificates of efficiency to comply with such regulations.

**c) Putting Back/Deviation**

If during the currency of this Charter, Vessel should put back while on voyage by reason of an accident or breakdown, or there is any deviation during the course of the voyage or any loss of time caused by sickness of or accident to crew or any person on board Vessel(other than supercargo travelling under Charters auspices) hire shall be suspended from time of her putting back until she is again in the same or, at Charterers discretion, an equidistant position and voyage resumed there from ( in the event of putting back from berth or an anchorage, from time of last line at a discharging berth/anchorage until time of first line at a loading berth/anchorage), or for time actually so lost as the case may be, and cost or extra bunkers consumed and all proven direct resulting extra expenses resulting there from, if any, shall be for Owners' account.

**d) Crane Breakdown - Delete**

**e) Strike/Arrest**

In the event that Vessel is delayed or rendered inoperative by strikes, labour stoppages or any other difficulties due to Vessel's flag. Ownership, management, registry, officers and crew or lack of their health certificates or trading prior to Vessel's coming on charter including cargoes so carried, such time lost to be considered as off-hire.

Should Vessel be arrested during the currency of this charter at the suit of any person having or purporting to have a claim against or any interest in Vessel, unless resulting from reasons falling under Charterers responsibilities, hire under this charter shall not be payable in respect of any period whilst Vessel remains under arrest or any period during which Charterers are denied full use of the Vessel.

**f) Bunker Consumption During Off-hire**

The value of bunkers consumed during any off-hire period under the Charter Party shall be for Owners' account, calculated at current prices with the latest supporting voucher issued by Oil Company.

**34. P& I Cover/Cargo Claim Handling**

Owners guarantee that the Vessel is entered and shall remain entered for the duration of this charter, into



SECOND ORIGINAL



**REKLUB**

<u>RIDER CLAUSES TO M/V "CONTI SYDNEY"</u>
<u>SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.</u>
<u>CHARTER PARTY DATED MAY 23RD, 2005</u>

a P&I Club for full cover in respect of protection and indemnity risks.

Charterers guarantee that they have arranged for and shall continue to have for the duration of this charter, a full cover for time-charter liabilities.

Notwithstanding anything in this Charter Party to the contrary, it is expressly agreed, that the Owners remain responsible for all personal injury to the extent of a full ship Owner P&I cover. Owners to remain fully P&I covered for cargo claims, for which Owners could be made responsible under the terms of the Charter- Party.

Owners however not to be responsible for any loss or damage to cargo stuffed into containers by Shippers and/or Charterers, unless caused by Owners whilst cargo is in care of the Vessel.

Owners P&I Club is: Gard.

Charterers P&I Club is: China Shipowners Mutual Assurance Association.

Cargo claims to be settled between Charterers and Owners in accordance with the Inter-Club New York Produce Exchange Agreement 1996.

**35. Financial Responsibility In Respect of Pollution**

(Pollution Charter Party Clause issued by INT. Group of P+I Clubs Sept 1996)

1. Owners warrant that throughout the currency of this charter they will provide the Vessel with the following certificates:

a) Deleted

b) Certificates issued pursuant to section 1016(a) of the Oil Pollution Act 1990, and section 108(a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended, in accordance with part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the vessel into the charter), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes)

2. Notwithstanding anything whether printed or typed herein to the contrary:

a) Save as required for compliance with paragraph (1) hereof, Owners' shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.



SECOND ORIGINAL



REKLUB

<u>RIDER CLAUSES TO M/V "CONTI SYDNEY"</u>
<u>SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.</u>
<u>CHARTER PARTY DATED MAY 23RD, 2005</u>

b) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bill of Lading issued pursuant to this charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

3. Charterers warrant that the terms of this clause will be incorporated effectively into any Bill of Lading issued pursuant to this charter.

### 36. Laycan and Delivery Notices

The Laycan fixed for this Vessel is 03 June/25 July 2005 – 0001/2359 hours local time to be narrowed to a 10-day-spread with Owners 30 days delivery notice and to a 5-day-spread with Owners 15 days delivery notice.

Owners shall keep Charterers closely informed of the present Charterers' redelivery intention and schedule after clean fixture.

Owners to tender 30/15/10/5 days approximate notice of delivery, followed by 3/2/1 days definite notice of delivery.

### 37. Bunkers on Delivery/Re-delivery

Charterers on delivery, and Owners on redelivery, shall take over and pay for all bunkers remaining onboard the Vessel. Bunker quantities on delivery as on board, bunker quantities on redelivery to be about same as quantities of delivery, however both always to be sufficient to reach the nearest main bunkering port.

Owners advise the approximate bunkers quantities as follows:

(REVERTING WITH FIGURES)

Bunker prices on delivery and redelivery as per median Platts Oilgram for each grade at the time and port of delivery and redelivery.

Bunkers costs on delivery to be paid with first hire but always against receipt of the bunker survey report.



SECOND ORIGINAL



REKLUB

## RIDER CLAUSES TO M/V "CONTI SYDNEY"
## SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
## CHARTER PARTY DATED MAY 23RD, 2005

Bunkers costs on re-delivery to be deducted from last sufficient hire payment.

Charterers shall have the option to bunker Vessel for their own account prior to delivery, provided same does not interfere with Owners business. Owners shall have the liberty to bunker Vessel for their account prior to re-delivery, provided not interfering with Charterers operation of the Vessel.

### 38. Hold Condition on Delivery - On/Off Hire Survey

a) Hold condition

Vessel's holds prior to delivery or on arrival at first loadport to be clean, swept, free of infestations, odours and cargo residues and suitable in all respects for the carriage of the maximum described intake of containers and to load any/all permissible cargoes under this charter.

In case cleaning of holds should become necessary during the currency of this charter, due to nature of cargo or cargo operations, such cleaning shall be for Charterers account including removal of residues.

On re-delivery holds to be in about same condition as on delivery, fair wear and tear and rust excepted.

Vessel to deliver with a full set of container lashing/securing units in good working order, sufficient for the maximum described intake of 20 and 40 ft containers on deck/under deck.(see also clause 61)

b) On/off hire surveys

A joint on-hire survey in delivery port, or first port after delivery, and a joint off-hire survey in redelivery port to be held and expenses for same to be shared equally between Owners and Charterers.

On-hire survey to be in Owners' time and off-hire survey in Charterers' time, unless simultaneously with Charterers' operations.

Survey by an independent surveyor acceptable to both parties, to include a statement of the lashing and securing materials on board.

Delivery and redelivery dates/times for purposes of calculating hire to be based on Beijing Shanghai time.

### 39. Reporting etc

During voyages, Master to keep Charterers and/or their Agents informed of Vessel's position and performance in accordance with the instructions received from Charterers. Charterers and their representative, inclusive of supercargo, to have the right to use Vessel's communication facilities. Charterers to reimburse Owners for such communications at actual cost.

### 40. Hire Payment



SECOND ORIGINAL



REKLUB

### RIDER CLAUSES TO M/V "CONTI SYDNEY"
### SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
### CHARTER PARTY DATED MAY 23RD, 2005

Payment of first hire and bunker value: Payment of first hire and value of bunkers onboard on delivery to be paid three(3) banking days after delivery.

Against Charterers' receipt of Owners' correct original invoices, Charterers to remit hire per telegraphic transfer to Owners' following bank account:

| | |
|---|---|
| Bank | : HSH Nordbank AG, Hamburg |
| Acct.No. | : US$ 1180023346 |
| IBAN No. | : DE 56210500001180023346 |
| Beneficiary | : Conti Cristallo Schiffahrts GmbH & Co. KG |
| | MV "Conti Sydney", Putzbrunn / Germany |

Owners to advance the invoices by email/fax and Charterers to check about the correctness. In case of any mistakes, charterers to notify owners immediately, enabling to correct the invoice in order to avoid any delays in payment.

### 41. Late Receipt of Hire Payments

With reference to clause 5 (five) it is agreed that the hire is to be considered correctly paid upon confirmation of Charterers' bank that money has been remitted irrevocably into Owners' account with value date when hire was due.

If hire has not been paid to Owners in time, Owners to notify Charterers in writing via brokers and also with copy direct to Charterers on Fax: +86-535-6285246 and give them four banking days grace to rectify such failure.

### 42. Deductions From Hire

Charterers shall have the liberty to deduct from last hire payment any amount disbursed for Owners account, off-hire and speed claims, previously agreed by Owners.

Charterers have the further liberty to deduct from last sufficient hire payment, estimated cost of bunkers remaining on board on redelivery, together with a reasonable estimated amount of disbursements for Owners account outstanding, for which vouchers have not yet reached Charterers. Notwithstanding anything stipulated to the contrary in the Charter Party, no deductions other than stipulated in this clause shall be made, unless with the prior written consent of the Owners.

### 43. Loading Instruction

Charterers or their Agents to provide Master with shippers/Agents declared weight of containers, information of containers with special and/or dangerous cargo, requiring special stowage/attentions, as well as total number of containers and destination prior to commencement of loading operation each port. Charterers to be responsible for any damages, delays and expenses as may arise in port or at sea from discrepancy between manifest and actual container weight.



SECOND ORIGINAL



REKLUB

### RIDER CLAUSES TO M/V "CONTI SYDNEY"
### SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
### CHARTER PARTY DATED MAY 23RD, 2005

**44. Breaking I.W.L.**

Subject to Owners' prior and reasonable approval, Charterers have the right to break Institute Warranty Limits. Charterers to reimburse any additional costs including but not limited to extra insurance incurred thereby.

**45. Smuggling**

Owners to be responsible for any consequences including but not limited to any fines/taxes imposed and off-hire time occurred owing to smuggling by Vessel's Master and/or Officers and/or crew and/or their representatives and or their passengers. Charterers to be responsible for consequences including but not limited to any fines/taxes imposed and off-hire time occurred owing to contraband and/or unmanifested drug or goods are found to have been shipped as part of the goods in containers on board.

**46. Deleted**

**47. Renaming and Charterers Colors**

Charterers have the privilege to rename vessel and/or fly their house flag and to paint and mark all outer, over water areas of the vessel, including funnel and paint Charterers' insignia at Vessel's sides in Charterers' colors/standard, at their expenses and time. Charterers to repaint and remark vessel in Owners' colors/standard before redelivery, at Charterers' expense and time. Owners to attend to administrative matters for the applications for both renamings and to present, in due time, respective vouchers supporting expenses incurred.

All expenses in connection with such renaming and for later renaming of the vessel to her old name to be

for Charterers account. Vessel to be renamed to her old name prior or upon redelivery. Any charter name is subject to Vessels registrys approval.

**48. Refund of Insurance Premium**

Charterers to have the benefit of any return insurance premium received by Owners from Underwriters(as and when received from Underwriters) by reason of the Vessel being in port for a minimum period of 30 days provided the Vessel is on hire, and all requirements under the terms of insurance policy for enjoying the insurance premium return are satisfied and paid to Charterers with assistance of Owners.

**Bimco Lay-up Clause**

The Charterers shall have the option of laying up the Vessel for all or any portion (exceeding 30 days) of the Charter period, in which case hire hereunder shall continue to be paid, but there shall be credited against such hire the whole amount which the Owners shall save(or reasonably should save) during such period of lay-up through reduction in expenses, less any extra expenses to which the Owner is put as a result of such lay-up. In case of lay-up Charterers to arrange for docking of the Vessel at their cost prior to Vessel



SECOND ORIGINAL



REKLUB

RIDER CLAUSES TO M/V "CONTI SYDNEY"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005

being put-back to service.

**49. Outbreak of War**

In the event of the outbreak of war(whether there be a declaration of war or not) between two or more of the following countries/areas and affecting Vessel's trading: Great Britain, U.S.A., C.I.S., Germany, Peoples Republic of China, Taiwan, Japan, both Owners and Charterers shall have the right of cancelling this Charter Party immediately and Vessel shall proceed to a safe and open port at Charterers option for discharging if required, and the Vessel to be redelivered thereafter.

**50. Hague Visby Rules/Bimco Hamburg Rules Clause**

A reference to the International Convention of the Unification of certain Rules relating to Bills of Lading, dated Brussels, the 25th August 1924 and Hague Rules of as amended by the Protocol signed in Brussels on the 23rd February 1986(the Hague Visby Rules) to be inserted in all Bills of Lading issued hereunder.

New Jason and New Both-To-Blame Collision Clause and Clause Paramount, as applicable to apply and form part of this Charter Party and to be incorporated in all Bills of Lading issued hereunder.

**Bimco Hamburg Rules Clause**

Neither the Charterers nor their Agents shall permit the issue of any Bill of Lading, waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the Owners or on the Charterers' behalf or of any sub-Charterers) incorporating where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg rules or any other legislation imposing its liabilities in excess of Hague or Hague/Visby Rules. Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

**51. Arbitration: Bimco Standard Law + Arbitration Clause 1998**

This contract shall be governed by and conducted in accordance with English law and any dispute arising out of or in connection with this contract shall be referred to arbitration in Hong Kong in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitration Association (LMAA) Terms current at the time when the arbitration proceeding are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and give notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of



SECOND ORIGINAL



**REKLUB**

**RIDER CLAUSES TO M/V "CONTI SYDNEY"**
**SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.**
**CHARTER PARTY DATED MAY 23RD, 2005**

any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In case where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

### 52. Stevedore Damages

Charterers are not to be responsible for damages to the Vessel unless same are notified in writing by the Master at the time of , or latest within 12 hours of, occurrence of damage, to Charterers or Charterers' Agents or supercargo. Master/Owners shall endeavour to obtain from responsible party acknowledgement of such claim. Hidden damages caused to the Vessel during the currency of this Charter Party to be reported as soon as discovered but latest on redelivery. All stevedore damages affecting Vessel's class, seaworthiness and cargo carrying capability to be repaired immediately on occurrence at Charterers' expenses. Other stevedore damages to be repaired at next drydocking or annual repairs at Charterers' expenses but in any case prior to re-delivery.

### 53. Double Banking

(a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering.

(b) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

### 54. Dangerous Cargo

Charterers are allowed to load max 750ts IMO cargo, provided packed, labelled, handled, loaded, stowed,



SECOND ORIGINAL



**REKLUB**

<u>RIDER CLAUSES TO M/V "CONTI SYDNEY"</u>
<u>SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.</u>
<u>CHARTER PARTY DATED MAY 23RD, 2005</u>

discharged in accordance with IMO and all other international and local regulations.

All extra equipment/fittings/insurance to be arranged and paid for by Charterers.

Prior loading of IMO cargo Master to be furnished in writing with all relevant information like IMO number etc.

The following cargoes always to remain excluded:

Livestock, nuclear and/or radioactive materials/fuels/products/wastes (unless for medical purposes and/or radio isotopes which to be allowed), toxic and/or chemical waste, arms/ammunitions (unless for sports/hunting purposes), explosives (except small quantities of fireworks which to be allowed) asbestos, ferrosilicone, hides, scrap, cargoes banned by United Nations, calcium hypochlorite of any nature.

### 55. Agents

The Charterers agree that their Agents will undertake normal/minor ship's husbandry as Owners' Agents, free of agency fee, Owners only to pay for services actually rendered. This shall not include any extraordinary business such as crew member desertion or being left in hospital, general average, repairs, damage to vessel and similar major items. In such case Owners shall appoint their own Agents or pay Charterers' Agents the relevant agent's fee.

### 56. Slow-Steaming

Charterers shall have the privilege of slow steaming the Vessel at any speed acceptable to Vessels machinery and hull.

### 57. Gangway Watchman

Watchmen for cargo/containers to be for Charterers account. Watchmen for Vessel to be for Owners account unless compulsory, then same to be for Charterers' account.

### 58. Container Clause

Securing of the cargo inside containers and/or other unit load shall be entirely the Charterers' concern and responsibility. Any damage to the Vessel, her tackle, apparel, furniture or anything else resulting from insufficient securing of cargo within containers and/or other unit load shall be repaired at the Charterers' expense and time. Charterers warrant that all containers will be sealed prior to loading.

### 59. Reefer Containers

Vessel to provide electric power as stated by Vessels' description and Master/crew to exercise due diligence in maintaining temperature and other conditions required. Crew to monitor reefer containers twice a day.



SECOND ORIGINAL



REKLUB

RIDER CLAUSES TO M/V "CONTI SYDNEY"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005

In case any malfunctions of reefer units are found, the Master/crew shall report immediately to Charterers and try for repair/maintenance in accordance with Charterers' instructions, provided spare parts are available for such work and weather permitting. Any spare parts/ time to be for Charterers' account and crew to be considered as Charterer's servants for this task. Owners can not be held responsible for malfunction of reefer containers provided vessel's crew has executed the task as above-mentioned with due diligence. Owners can not be held responsible for malfunction of reefer containers unless resulting from ships failure of supply sufficient electrical power.

**60. Bimco Linertime Ice Clause**

The vessel not to be ordered to nor bound to enter any ice-bound place or any place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival or where there is risk that ordinarily the Vessel will not be able on account of ice to reach the place or to get out after having completed loading or discharging. The Vessel not to be obliged to force ice, nor to follow ice-breakers when inwards bound. If on account of ice the Master considers it dangerous to remain at the loading or discharging place for fear of the Vessel being frozen in and/or damage, he has the liberty to sail to a convenient open place and await the Charterers' fresh instruction. Detention through any of the above causes to be for the Charterers' account.

**61. Owners Lashing Gear**

Owners on delivery to supply the vessel with a full set of container lashing/securing materials/units which to be maintained/reconditioned by the Vessel throughout the charter period at all times for stowing containers up to maximum quantity of 20/40 ft containers, as per Vessel's description.

Charterers are to be responsible for any lashing gear lost or damaged, ordinary wear and tear excepted, Charterers to reimburse Owners for replacing lost/damaged Lashing gear at actual costs.

**62. Errors - Notices Between Parties**

To offset errors, Owners or Charterers to give each other at least 48 hours substantiated written notice before exercising their rights under this Charter Party.

**63. Vessel's Plans**

Owners to make available to Charterers, as soon as practical after fixing main terms, clear and legible English language GA, Capacity, Container stowage plans, lashing plan approved by class, loading scale, hydrostatic curves, tankplan, trim and stability tables, speed and consumption curves, bay plans, and any other plan, tables, instructions book/s, a complete set of copies of all Vessel's certificates together with a color photograph of the Vessel for Charterers' purposes.

**64. Non-Containerized Cargoes**

It is understood that charterers will employ the Vessel in the container trade. Charterers to have the option



SECOND ORIGINAL



**REKLUB**

RIDER CLAUSES TO M/V "CONTI SYDNEY"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005

to also load lawful general breakbulk allowed for a cellular full-container Vessel, provided complying fully with IMO and other relevant regulations. Any extra insurance and/or any extra expenses and/or loss of time to be for Charterers account. Any deck cargo to be loaded at charterers risk and expenses but always as far as Vessels stability permits. Relative extra insurance to be for Charterers account. In case of deck stowage Bills of Lading to be claused accordingly. (see CL98)

**65. Dues/Taxes**

All dues and taxes on cargo and/or freight/Vessel or levied against Vessel due to her having cargo on board to be for Charterers' account (except income tax levied in the country of the Vessel and/or her Owners domicile which to be for Owners' account).

Any taxes/fees that may be levied on the charter-hire by any country or authority, other than income tax and/or other levies/taxes/fees that are normally payable by Owners in the country of Vessel's/Owners domicile and/or registry or residence, shall not be for Owners account.

**66. Container Handling Experience**

Master, chief officer and cargo officer to have container handling experience.

**67. Quarantine Time / Expenses etc.**

Normal quarantine time and expenses to enter the port to be for Charterers account but any time of detention and expenses for quarantine due to pestilence, illness, etc. Of Master, officer and crew to be for Owners account.

It is the responsibility of the Master and the Owners to arrange for vaccinations required for ports of call/ trading area where Vessel is employed and to keep on board corresponding valid certificates.

Any additional quarantine expense or time due to Charterers having traded Vessel to places considered unhealthy and as a result thereof requiring additional quarantine expenses or waiting time or additional vaccination of crew, at subsequent ports of call, shall be for Charterers account.

**68. Stowaway Clause- Bimco Stowaways Clause**

a)    (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaway have gained access to the Vessel by means of secreting away in the goods and/ or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and



SECOND ORIGINAL



**REKLUB**

### RIDER CLAUSES TO M/V "CONTI SYDNEY"
### SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
### CHARTER PARTY DATED MAY 23RD, 2005

howsoever incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.

(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to sub-clause(a)(ii)above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

(b) (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses what so ever and howsoever incurred, including fines, shall be for the Owners' account and the Vessel shall be off hire.

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by Charterers, the Owners shall take all reasonable steps to secure that within a reasonable time, the vessel is released and at their expense put up bail to secure release of the Vessel.

**69. War Clause**

The Bimco War Risks Clause for Time Charters, 2004(CONWARTIME 2004) is deemed to be fully incorporated in this Charter Party.

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat Charterers, disponent Owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported:

war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.



SECOND ORIGINAL



**REKLUB**

### RIDER CLAUSES TO M/V "CONTI SYDNEY"
### SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
### CHARTER PARTY DATED MAY 23RD, 2005

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(d) (i)  The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may  render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or  other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other



SECOND ORIGINAL



RIDER CLAUSES TO M/V "CONTI SYDNEY"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005

sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

**70. Deleted**

**71. Through and House-to-House Containers**

Charterers to keep Owners harmless for any additional expenses and/or damage to containers and/or cargo if through or House-to-House Bills of Lading are signed, if damage/additional expenses occur after actual discharging from or prior to loading on this Vessel.

**72. Option of Premature Termination**

Should the Vessel during the performance of this charter be off-hire for a period of more than forty(40) consecutive days, Charterers have the option to terminate this Charter Party at the place where it occurs and Vessel shall proceed to a safe port at Charterers' option for discharging if required. Vessel can be redelivered only in case Vessel is empty.

Owners shall have no obligation from Bill of Lading issued under the Charter Party when charter is terminated.

During the currency of this Charter Party, the Vessel is to be trading on Charterers' container service and it is imperative that the Vessel has to keep to schedule. Should the Vessel be persistently delayed by engine or essential gear breakdowns and/or other causes affecting her schedule(it being understood that such causes as grounding, collision, or similar cases are excluded) Charterers shall notify Owners who shall take all reasonable steps to rectify problems.

**73. Weather Routing**

Charterers may supply Oceanroutes advice to the Master, during voyages specified by the Charterers. The Master to comply with the reporting procedure of the routing service selected by Charterers, unless Master considers route as not safe.

**74. Inventory of Charterers' Equipment**



SECOND ORIGINAL



REKLUB

RIDER CLAUSES TO M/V "CONTI SYDNEY"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005

The Master, as far as possible, to keep a record of all Charterers' gear, equipment and/or stores supplied to the Vessel and to maintain same in good condition. Such gear, equipment, and/or stores to be redelivered to Charterers prior to redelivery of Vessel to Owners or, if requested by Charterers, at any time during the period of the charter, in like good order and condition as supplied (ordinary wear and tear excepted). Owners to make good any shortage and/or damage unaccounted for, unless caused by negligence of Charterers, their servants or Agents.

## 75. Deleted

## 76. Container Loading

Charterers have the option to load in and/or on all hatches empty and/or full containers but in agreement with the Master with reference to the strength of the hatches and the stability of the Vessel and her visibility line. The crew, as far as weather conditions permit, to daily watch the conditions of the containers carried and relash same or tighten the lashings whatever may become necessary during the voyage.

## 77. Crew Assistance

Timecharter hire to include but not to be limited to following works and rendering customary assistance by the crew, provided allowed by local authorities/regulations/unions.

a) To get the vessel always ready for cargo work to avoid wasting time in any case.
b) Deleted
c) Shifting operation and docking/undocking
d) Bunkering
e) Maintaining power while loading and/or discharging
f) Supervision/enabling stevedores to perform the cargo operations
g) Deleted
h) To prepare Vessel's hatches/holds and all lashing/securing materials properly on deck and/or in holds prior to arrival to ports or commencement of operations.
i) To pay due attention to the cargo on board throughout the voyage.
j) Cooling and ventilation instructions for reefer containers to be given in writing by Charterers to the Master prior to loading.

## 78. Vessel Inspection

Charterers to have the option of holding a condition inspection at any time during the currency of this Charter Party with 14 days notification. The Owners and Master giving every facility and assistance to carry out this inspection which to be carried out without interrupting the working of the Vessel and without incurring expenses for the Owners.

## 79. Supercargo

In reference to clause 10 of this Charter Party, the Owners to provide a clean and acceptable room



SECOND ORIGINAL



**REKLUB**

RIDER CLAUSES TO M/V "CONTI SYDNEY"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005

available for the supercargo, furnished to the same standard of other officers' cabins on board the Vessel, having also a writing table available.

The Charterers supercargo/representative to be afforded every courtesy and co-operation of the Vessel's command and to have free and unlimited access to the whole Vessel including bridge, holds and engine rooms, and also to vessel's tanks including but not limited to bunkers, lubrication oil sludge, ballast and freshwater tanks, also to the Vessel's deck and engine logbooks, made during the charter period, tank plans, calibrations scales and/or other plans as requested/required. Supercargo to sign the Letter of Indemnity which shall be in the standard form of Owners' P&I Club.

**80. Deleted**

**81. Deleted**

**82. Deleted**

**83. Description of Vessel**

M/V 'CONTI SYDNEY'

GEARLESS CONTAINER VESSEL
CONTAINER INTAKE 1.597 UNITS 20/8/8'6"

STOWAGE HOLD: 618 UNITS
DISTRIBUTION: 100/116/126/128/134/14 - 1ST/2ND/3RD/4TH/5TH/6TH TIER

STOWAGE ON DECK IN FRONT OF BRIDGE: 128 UNITS
DISTRIBUTION: 18/22/22/22/22/22 - 1ST/2ND/3RD/4TH/5TH/6TH TIER

STOWAGE ON HATCHES: 853 UNITS
DISTRIBUTION: 166/186/186/186/129 - 1ST/2ND/3RD/4TH/5TH TIER
INCLUDING 56 UNITS BEING STOWED LATITUDINAL

ALTERNATIVELY
780 UNITS 40/8/8'6" PLUS 28 UNITS 20/8/8'6"
STOWAGE HOLD: 298 UNITS 40' PLUS 22 UNITS 20'
DISTRIBUTION: 46/56/62/62/66/6 - 1ST/2ND/3RD/4TH/5TH/6TH TIER ALL 40'
8/ 4/ 2/ 4/ 2/2 - 1ST/2ND/3RD/4TH/5TH/6TH TIER ALL 20'

STOWAGE ON DECK IN FRONT OF BRIDGE: 64 UNITS
DISTRIBUTION: 9/11/11/11/11/11 - 1ST/2ND/3RD/4TH/5TH/6TH TIER ALL 40'

STOWAGE ON HATCHES: 418 UNITS 40' + 6 UNITS 20'



SECOND ORIGINAL



REKLUB

<u>RIDER CLAUSES TO M/V "CONTI SYDNEY"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005</u>

DISTRIBUTION: 83/92/92/92/59 - 1ST/2ND/3RD/4TH/5TH TIER - ALL 40'
INCLUDING 28 UNITS 40' STOWED LATITUDINAL
0/ 2/ 2/ 2/ 0 - 1ST/2ND/3RD/4TH/5TH TIER - ALL 20'

- CONTAINER INTAKES ARE ALWAYS SUBJECT TO VESSEL'S STABILITY/TRIM,
PERMISSABLE WEIGHT, LASH FORCES, BENDING MOMENTS, VISIBILITY LINE
AND CARGO SECURING MANUAL

- FITTINGS:
FULLY FITTED WITH 40' CELLS IN HOLDS (2 X 20' UNITS CAN BE STOWED
INTO EACH 40' CELL BY USE OF STACKING CONES), FITTED
WITH NECESSARY LOOSE LASHINGS/FITTINGS TO SECURE CONTAINERS
AS FOLLOWS:
UNDER DECK: abt. 100PCT OF NOMINAL UNDER-DECK TEU-CAPACITY
ON DECK : abt. 80PCT OF NOMINAL ON-DECK TEU-CAPACITY.

- 120 REEFER-POINTS (FEMALE) ON DECK (120 x 9KW)
440 VOLT/3 PHASE/60 CYCLES

- STRENGTH OF DECKS/HATCHES:
TANKTOP - STACKLOAD: 120T/150T PER 20'/40' STACK
ON DECK IN FRONT OF BRIDGE - STACKLOAD: 51T/100T PER 20'/40' STACK
ON HATCHES - HATCHCOVERS 3-8 - S'LOAD: 50T/ 80T PER 20'/40' STACK
HATCHCOVERS 1-2 40+46/80T PER 20'/40' STACK

- STABILITY:
STABILITY ACCORDING TO BUILDING YARD BEING GRANTED ACCORDING
TO S.B.G. REGULATIONS WITH 1.168 TEU OF 14 MT HOMOGENEOUSLY
LADEN, ALWAYS IRRESPECTIVE OF BUNKERS ON BOARD.

ABT. 23.300 MT DWAT SFB ON ABT. 10.65M
ABT. 16.236/9.475 GT/NT (BRZ/NRZ) (ACCORDING TO LONDON RULES)

CLASS G.L. + 100 A5 E + MC, E 'AUT' 'CONTAINERSHIP'
ENGINE/BRIDGE AFT - GERMAN FLAG - OWNERS OPTION TO CHANGE FLAG AT ANY
TIME - BUILT 1990 - ANY COSTS/EXPENSES ON VESSELS FLAG AND AGE TO BE FOR
CHRTRS ACCOUNT

ABT. 18.0 KNOTS ON ABT 45.0 MT HEAVY FUEL BASIS DRAFT OF 9,70M
(BASIS EVEN KEEL) BUT EXCL. SHAFTGENERATOR BUT INCL. 1 AUX. ENGINE
(CONSUMING HEAVY FUEL AS WELL AND THE CONSUMPTION IS ALREADY
INCLUDED IN ABOVE MENTIONED 45.0 MTONS)
SPEED/CONSUMPTION FIGURES ARE ON TOWING TANK VALUE AND BASED



SECOND ORIGINAL



**REKLUB**

RIDER CLAUSES TO M/V "CONTI SYDNEY"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005

ON ISO STANDARD WITH NET CALORIFIC VALUE 42.700 KJ/KG (10.200 KCAL/KG)
AND ISO STANDARDS REFERENCE CONDITIONS (+ 3 0/0 ALLOWANCE)
EXCLUDING SHAFTGENERATOR (400KW) AND EXCL. ANY REEFER UNITS
CARRIED/CONNECTED.
MAIN ENGINE IS ABLE TO BURN UPTO IF 380 CST.

- ALL SPEED/CONSUMPTION ARE BASIS GOOD WEATHER CONDITIONS
OF MAX BFT 3 OR DOUGLAS SEASTATE 2 AND ON EVEN KEEL, ON CLEAN
AND SMOOTH BOTTOM, DEEP AND CURRENTLESS WATER WITH MAX TEMP.
OF 28 DEGR. CELS. AND ENGINE ROOM TEMPERATURE OF MAX. 45 DEG. CELS.

- CHARTERERS SHALL SUPPLY SUITABLE FUELS TO ENABLE MAIN PROPULSION
AND AUXILIARY MACHINERY TO OPERATE EFFICIENTLY AND WITHOUT
HARMFUL AFFECTS. THE FUEL OIL SUPPLIED TO BE IN ACCORDANCE
WITH FOLLOWING SPECIFICATION:
ISO 8217:1996 - RMG 35 AND DMB FOR MDO AND/OR LATEST AMENDMENT THERETO,
IGNITION QUALITY NOT EXCEEDING CCAI850 FOR FUEL

- MAIN ENGINE DIESEL: BV/MAN B.W., TYPE 6L 60 MC
DEVOLOP. 9900 KW AT ABT. 111 RPM
VESSEL HAS ONE EMERGENCY DIESEL AUXILIARY ENGINE BURNING MARINE
DIESEL OIL

- ANY COSTS/EXPENSES ON VESSEL'S FLAG AND AGE TO BE FOR CHARTERERS'
ACCOUNT.
- PORT CONSUMPTION BASIS IDLE: ABT. 1.5 T MDO + 1,0 MT FOR BOILER
ALWAYS WITH NO REEFER-UNITS CONNECTED

- FITTED WITH SHAFT GENERATOR WHICH TO BE DISENGAGED IF VESSELS
MAIN ENGINE REVOLUTIONS BELOW 86/FITTED WITH BOW THRUSTER

3 HOLDS / 8 HATCHES
NO. 1 : 12.43 X 20.50/15.60 M
NO. 2 : 12.43 X 20.50 M
NO. 3-8 EACH: 12.43 X 23.03 M - FITTED WITH PONTOON-HATCHCOVERS WITH TRIPLE
SECTION EACH

TANK CAPACITIES:
FUEL - ABT. 1870 T
MDO - ABT. 180 T
FRESHWATER - ABT. 340 T - FITTED WITH FRESHWATER EVAPORATOR
FITTED WITH ALL MODERN NAUTICAL AIDS/PANAMA-SUEZ CANAL
FITTED/SATELLITE NAVIGATION/WEATHERCHART-RECORDER/INMARSAT-SYSTEM
LOA: 163.48M / LBP: 154.41M / BM: 27.50 M



SECOND ORIGINAL



REKLUB

RIDER CLAUSES TO M/V "CONTI SYDNEY"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005

ABOVE IS ALL ABOUT AND WITHOUT GUARANTEE
LAST UPDATED: 16.12.2004

**84. Captions of Clauses**

The caption and headings of clauses herein are inserted for convenience only and shall not be construed to have any restrictive effect on the text herein.

**85. Strikes Pilots/Tug Boats etc**

Owners not to be responsible for any loss of time or other consequences/expenses resulting from any strike of pilots, tug-boats, linesmen, or other shore labour, unless resulting from Vessel's/Owners failure to comply with the terms of the Charter Party or being caused by reason of Owners' side.

**86. Trading Exclusions**

World wide trading always via safe port(s), safe berth(s), safe anchorage(s), always afloat, always accessible and always within Institute Warranty Limits with lawful merchandise in ISO containers only.

Trading exclusions: Angola including Cabinda, Cabinda, Cambodia, Congo, Cuba, Denmark, Ethiopia, Finland, Georgia, Great Lakes, Gulf of Aqaba, Haiti, Iceland, Iran north of Bandar Abbas, Iraq, Israel, Lebanon, Liberia, Libya incl. Gulf of Sidra/Sirte, Nigeria, North Korea, Norway, Russia, Somalia, Sweden, Syria, Turkey, Turkish occupied Cyprus, Yemen, Zaire, war and/or warlike zones and/or countries which result in blacklisting and/or sanctions by the UN. Calling P.R.C. and Taiwan directly (or vice versa) is not allowed unless same is allowed by both authorities. Trading in ice is not allowed.

**87. Reinsertion In Trading Limits**

It is agreed that, from time to time, should the political/trading situation change, the Charterers can ask for reinsertion in trading limits of an excluded country and the Owners can ask for insertion of another excluded country. Both parties agree not to unreasonably withhold their consent, but Owners reserve their rights to maintain trading status as per governing Charter Party terms.

**88. Deleted**

**89. Deleted**

**90. Liability Insurance**

The Charterers shall not be responsible for loss of life nor personal injury nor arrest or seizure or loss or damage to the Vessel and/or other objects arising from perils insured by customary policies of insurance.

**91. Off-Hire**

" Conti Sydney " / Syms                                    - 24 -



SECOND ORIGINAL



### RIDER CLAUSES TO M/V "CONTI SYDNEY"
### SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
### CHARTER PARTY DATED MAY 23RD, 2005

After suspension of hire, from any cause, the Vessel shall be placed again at Charterers' disposal at the same port, or place, or an equidistant position where hire was suspended.

Charterers may, however, in their option accept the Vessel on hire again in such position and at such time as the vessel may again in all respects be ready to comply with the orders and directions of the Charterers.

During any off-hire period estimated to exceed 8 days, the Owners to give the Charterers not less than 3 (three)days definite notice of resumption of the service.

If the Vessel has been off-hire for a total period of 40 (forty) consecutive days during this Charter Party, the Charterers are at liberty to cancel the balance of period of this Charter Party, and redelivery shall take place upon Vessel being free of cargo.

### 92. War Risk Insurance

The Owners warrant that the Vessel shall remain insured throughout this Charter Party against basic war risks with the insurance company as stated in the description clause at Owners expense.

Any additional war risk insurance premiums for trading to areas declared as additional premium areas by Underwriters to be for Charterers' account.

### 93. Deleted

### 94. Deleted

### 95. Deleted

### 96. Change of Flag/Registry/Sale of Vessel

The Owners have the option to sell and/or to reflag (flag to be mutually agreed) the vessel during the currency of this charter period, which to be subject to Charterers' prior approval of new Owners and/or new flag, and subject to mutual agreement to the terms and conditions of a Tripartite Agreement which to be signed by Owners, new Owners and Charterers, which not to be unreasonably withheld, Owners have the option to sell the vessel.

It is agreed that such sale of ship and/or change of ownership shall, in no way and/or by no reason, reduce the Charterers' utilization of the vessel. The new Owners, as if they were the original owners, undertake to perform the balance of this Charter Party as per the same terms and conditions as agreed in the Charter Party and any amendments thereto with the original owners.

### 97. Stowage/Supervision

The Master shall supervise stowage of the cargo as well as instruct one of his officers to supervise all loading, handling and discharge of cargo and it is understood that the stowage plan normally prepared by



SECOND ORIGINAL



**REKLUB**

RIDER CLAUSES TO M/V "CONTI SYDNEY"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005

Charterers, but in which case, vessel/master/chief officer still have the obligation to check, approve and confirm same which shall not be unreasonably withheld.

### 98. Deck Cargo

The full deck is to be at Charterers disposal for cargo, subject to Vessel's stability, trim, visibility and permissible weights. Any non-containerized cargo shipped on deck to be in Master's discretion, which however not to be unreasonably withheld, and always carried at Charterers Risk, expense and responsibility. The respective Bills of Lading to be claused accordingly.

Owners not to be responsible for damages to or loss of cargoes loaded on deck in open top and/or flat rack containers, if caused by weather and/or seawater influence. The respective Bills of Lading to be claused accordingly.

### 99. Drydocking

Charterers to give owners the opportunity to perform necessary drydocking only when class requires or in case of emergency during the currency of this charter at a convenient time and place, which to be mutually agreed upon between the owners and the charterers. Charterers to release vessel at charterers' berth free of cargo.

The class required drydocking (for special survey) is currently expected as follows (according to owners' information):

| | last drydocking | next drydocking |
|---|---|---|
| - MV Conti Sydney | 10 / 2004 | 10 / 2007 |

The Owners shall give the Charterers a 3 (three) months prior notice when, where and how long they are intending to drydock the vessel.

The place of dry-docking to be within the trading area or as close as possible.

After drydocking is completed owners shall deliver the vessel to the same berth where the vessel is released or at anchorage if the said berth is occupied.

On commencement of drydocking owners shall advise charterers about expected duration of drydocking and shall tender daily notices of delivery to charterers for resuming the service.

### 100. Deleted

### 101. Registration for Transport of Hazardous Materials

Charterers warrant that they have filed a registration statement with the United States Department of Transportation, Research and Special Programs Administration(RSPA) for certain persons engaged in the offering for transportation and transportation of certain hazardous materials in foreign, intrastate or

SECOND ORIGINAL



REKLUB

RIDER CLAUSES TO M/V "CONTI SYDNEY"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005

interstate commerce in accordance with the Hazardous Materials Transportation Uniform Safety Act of 1990(HMTUSA) and will remain so during the duration of this charter. Charterers to be responsible for all permits and registrations for/of hazardous and IMO cargoes necessary to enter and/or trade in and out of all ports during the currency of this charter and shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including fines) imposed on Owners and/or Vessel due to nonfulfilment of the requirements of the RSPA.

## 102. Insured Risks

Owners to keep the Vessel fully insured against all hull risks as per Institute Time Clauses (hulls) 1.10.1983 including RDC or equivalent conditions and usual deductibles.

## 103. Deleted

## 104. Bimco Non-Lien Provision Clause

Charterers will not suffer nor permit to be continued, any lien or encumbrance incurred by them or their Agents, which might have priority over the title and interest of the Owners in the Vessel.

In no event shall Charterers procure, or permit to be procured, for the Vessel, any supplies, necessaries or services without previously obtaining a statement signed by an authorized representative of the furnisher thereof, acknowledging that such supplies, necessaries or services are being furnished on the credit of Charterers and not on the credit of the Vessel or of her Owners, and that the furnisher claims no maritime lien on the Vessel therefore.

## 105. Oil Spillage

Charterers will not be held responsible for oil pollution or pollution damage caused by the Vessel if the pollution or damage do not arise out of Charterers' acts or due to Charterers' faults.

## 106. Deleted

## 107. Charterers' Servants

Notwithstanding anything else contained in this Charter Party "Charterers' servants" shall always exclude Master, Officers and/or Crew and/or Owners' representatives in this Charter Party unless they are required by Charterers to fulfil Charterers' obligations under this Charter Party.

## 108. Midstream Operations

Cargo operations at midstream/buoys/etc. only allowed in cargo areas where barges can go alongside at vessel's maximum breadth. At no time barges allowed staying under vessels bow- and/or stern-area.

## 109. Bunker Quality Control Clause



SECOND ORIGINAL



**REKLUB**

RIDER CLAUSES TO M/V "CONTI SYDNEY"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO,
CHARTER PARTY DATED MAY 23RD, 2005

1) The charterers shall supply bunkers of a quality suitable for burning in the vessel's engines and auxiliaries and which conform to the specification(s) mutually agreed under this charter in accordance with iso 8217 1996 international standards.

2) At the time of delivery of the vessel the owners shall place at the disposal of the charterers, the bunker delivery note(s) and any samples relating to the fuels existing on board.

3) During the currency of the charter the charterers shall ensure that bunker delivery notes are presented to the vessel on the delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the vessel's bunkering manifold and sealed in the presence of competent representatives of the charterers and the vessel.

4) The fuel sample shall be analysed by DNV, of which expenses to be equally shared by Owners and Charterers with supporting vouchers attached.

### 110. BIMCO Fuel Sulphur Content Clause

Notwithstanding anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to meet the maximum sulphur content requirements of any emission control zone when the Vessel is trading within that zone. The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Clause.

For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

### 111. Electrical Power From Shore Clause

The vessel is not AMP fitted.

### 112. ISPS CLAUSE FOR TIME CHARTER PARTIES

(a)(i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company".

Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers.

The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).



SECOND ORIGINAL



REKLUB

RIDER CLAUSES TO M/V "CONTI SYDNEY"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b)(i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence.

All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

113. Requisition Clause

Requisitions: Should the Vessel be requisitioned by any government or governmental authority during the period of this Charter Party, it shall be off hire during the period of such requisition and any hire or other compensation paid by any government or governmental authority in respect of such requisition shall be paid to the Owners. However, the Charterers shall have the option of cancelling the balance period of this Charter Party, provided this option is exercised within 14 days of receipt of notice of requisition.

114. In case vessel to call the US or Canada, following clauses to apply:

U.S. Customs Advance Notification/AMS Clause for Time Charter Parties

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall

SECOND ORIGINAL



REKLUB

RIDER CLAUSES TO M/V "CONTI SYDNEY"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005

in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);
ii) Have in place an ICB (International Carrier Bond);
iii) Provide the Owners with a timely confirmation of i) and ii) above; and
iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

U.S. Security Clause for Time Chartering

If the Vessel calls in the United States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures:

Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence.

US Tax Reform Clause

Any U.S. Gross Transportation Tax as enacted by the United States Public Law 99-514, (also referred to as The U.S. Tax Reform Act of 1986), including later changes or amendments, levied on income attributable to transportation under this charter party which begins or ends in the United States, and which income under the laws of the United States is treated as U.S. source transportation gross income, shall be reimbursed by the Charterers.

US Trade - Unique Bill of Lading Identifier Clause

The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill of Lading Identifier as required by the U.S. Customs Regulations (19 CRF Part 4 Section 4.7.a) including subsequent changes,

SECOND ORIGINAL



REKLUB

## RIDER CLAUSES TO M/V "CONTI SYDNEY"
## SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
## CHARTER PARTY DATED MAY 23RD, 2005

amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account.

### US Anti Drug Abuse Act 1986 Clause

(a) In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986, or any re-enactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly.

Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account and the Vessel shall remain on hire. Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense put up bail to secure release of the Vessel.

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the Vessel's personnel.

(b) In pursuance of the provisions of sub-clause (a) above, the Owners and the Charterers warrant that they shall both become signatories to the Sea Carrier Initiative Agreement on signing this Charter Party or on delivery of the Vessel under this Charter, whichever is the earlier, and will so remain during the currency of the Charter.

### C-TPAT Clause

The Charterers have voluntarily signed the C-TPAT Agreement with the U.S. Customs Service. The Owners, Master and Crew will use reasonable efforts to assist the Charterers to comply with their obligations under the C-TPAT Agreement. However, under no circumstances shall the Owners, Master and Crew be liable for any delays, losses or damages howsoever arising out of any failure to meet the requirements of the C-TPAT Agreement signed by the Charterers.

The Charterers agree to indemnify and hold the Owners, Master and Crew harmless for any claims made against the Owners, Master and Crew or for any delays, losses, damages, expenses or penalties suffered

SECOND ORIGINAL



### RIDER CLAUSES TO M/V "CONTI SYDNEY"
### SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
### CHARTER PARTY DATED MAY 23RD, 2005

by the Owners arising out of the C-TPAT Agreement signed by the Charterers.

**USA Clause Paramount (if applicable)**

This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16th 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of it's rights or immunities or an increase of any of it's responsibilities or liabilities under said Act. If any terms of this Bill of Lading to be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

**Canada Clause Paramount (if applicable)**

All the terms, provision and conditions of the Canadian Water Carriage of Goods Act 1936, and of the rules comprising the schedule thereto are, so far as applicable, to govern this contract contained in the Bills of Lading issued under this Charter Party and the shipowners are entitled to the benefit of all privileges, rights and immunities contained in such act and in the schedule thereto as if the same were herein specifically set out. If anything herein contained by inconsistent with the said provisions, it shall be to the extent of such inconsistency and so further be null and void.

**115. Off-hire Period**

Charterers have the option to add on the charter period any part of off-hire periods. Once charterers have tendered the first redelivery notice, they have waived this option.

\*\*\*\*\*\*\*\*



SECOND ORIGINAL



REKLUB

RIDER CLAUSES TO M/V "CONTI SYDNEY"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005

Attachments to this Charter Party

### GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to York/Antwerp Rules, 1974 and any subsequent amendments, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply.

### NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery."

And the Charterer shall procure that all Bills of Lading issued under this Charter party shall contain the same clause.

### GENERAL CLAUSE PARAMOUNT

The Bills of Lading shall have effect subject to the provision of any legislation incorporating the rules contained in the international convention for the unification of certain rules relating to Bills of Lading dated Brussels. 25th August 1924(the Hague rules) or those rules as amended by the protocol signed at Brussels. February 23rd. 1968 (the Hague Visby Rules) and which is compulsorily applicable to the contract of carriage contained herein. If no such legislation is compulsorily applicable, the Hague rules or, if applicable, the Hague Visby Rules as enacted in the country of the port of loading shall apply. When no such enactment is in force in the country of the port of loading the corresponding legislation of the country of the port of discharge shall apply and in the absence of any such legislation, the terms of the 1924 convention as amended by the 1968 protocol shall apply.

Neither the Charterers nor their Agents shall permit the issue of any Bill of Lading, waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the Owners or on the Charterers' behalf or on behalf of any sub Charterers) incorporating the Hamburg Rules or any legislation giving effect to the Hamburg rules or any other legislation imposing liabilities in excess of Hague or Hague Visby Rules. Charterers shall indemnify the owners against any liability, loss or damage which may result from any breach of the fore going provisions of this clause.

SECOND ORIGINAL



REKLUB

<u>RIDER CLAUSES TO M/V "CONTI SYDNEY"</u>
<u>SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.</u>
<u>CHARTER PARTY DATED MAY 23RD, 2005</u>

## NEW BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

## BOTH TO BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owner of the said goods, paid or payable by the other non carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

And the Charterer shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

- End -



Exh. B

**MV CONTI SYDNEY - c/p dd 23.05.2005**

unsettled owners' invoices

| date | inv. no. | amount USD |
|---|---|---|
| 24.04.2007 | 20/07/01 rt/rp/vict. 1-03/07 | 2.498,01 |
| 26.04.2007 | 20/07/02 DNV bunker samples | 1.100,00 |
| 09.07.2007 | 20/07/03 DNV bunker samples | 637,50 |
| 23.07.2007 | 20/07/04 rt/rp/vict. 4-6/07 | 3.048,43 |
| 28.08.2007 | 20/07/05 Notice of Repair S1/98/99/102/103/104 | 432,85 |
| 18.10.2007 | 20/07/06 rt/rp/vict. 7-9/07 | 4.598,24 |
| 18.10.2007 | 20/07/07 DNV - bunker samples 07-09/07 | 687,50 |
| 24.12.2007 | 20/07/08 Re-charged expenses (unknown vessel) | 892,71 |
| 15.01.2008 | 20/08/01 rt/rp/vict. 10-12/07 | 4.656,97 |
| 17.01.2008 | 20/08/02 DNV - bunke samples 10-12/07 | 412,50 |
| 21.04.2008 | 20/08/03 rt/rp/vict. 01-03/08 | 4.184,94 |
| 25.04.2008 | 20/08/04 DNV - bunker samples 01-03/08 | 1.237,50 |
| 29.05.2008 | 20/08/05 Repairs at Keppel Shipyard | 65.851,41 |
| | | **$90.238,56** |
| | | |
| hire payment 09.04.08 - 24.05.08 | | **$380.250,00** |
| hire payment 24.05.08 - 08.06.09 | | **$380.250,00** |
| hire payment 08.06.08 - 23.06.08 | | **$380.250,00** |
| hire payment 23.06.08 - 08.07.08 | | **$380.250,00** |
| | | |
| **total balance due to owners** | | **$1.611.238,56** |



Exh. C



**SECOND ORIGINAL**

# *Time Charter*

### Government Form

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  THIS CHARTER PARTY, made and concluded in ...*BJG, 23rd* ..... day of ........*May*.................................19.... 2005 .......
2  Between.......*Conti Cristallo Schiffahrts-GmbH & Co.KG MS 'CONTI BARCELONA', Puttbrunn/Germany*.......
3  Owners of the good .........................(Steamship)(Motorship) ....... *MV'CONTI BARCELONA' - descriptions See Clause 83* -....... of ........
4  of..............tons gross register, and..................................tons net register, having engines of.................indicated horse power
5  and with hull, machinery and equipment in a thoroughly efficient state, and classed................................
6  at..................of about...........................cubic feet bale capacity, and about....................................tons of 2240 lbs.
7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,
8  allowing a minimum of fifty tons) on a draft of........feet......inches on..........summer freeboard, inclusive of permanent bunkers,
9  which are of the capacity of about........................tons of fuel, and capable of steaming, fully laden, under good weather
10 conditions about......................knots on a consumption of about......................tons of best Welsh coal-best grade fuel oil-best grade Diesel oil,
11 now.......*trading*........................................................................
12 ..................and........*Messrs. S.Y.M.S.(Shandong Yantai International Marine Shipping Co.)*...Charterers of the City of........*Shandong, PR China*......
13 WITNESSETH, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14 about.....*a time charter period of 48 months plus 45 days / minus 30 days, exact period in Charterers' option*.
15 .............................................................................................................within below mentioned trading limits.
16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter *subject to Owners approval and giving reason if*
17 *disagree within 48 hours when Owners receive notice of sublet from Charterers*, but Charterers remaining responsible for
   the fulfilment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligation hereunder.*
18 *Vessel to be placed at the disposal of the Charterers, at on arrival at first sea pilot station of Hong Kong any time day and night Sundays and Holidays*
19 *included.* Owners shall give Charterers notice of vessel's delivery date in accordance with Clause 36..............................
20 in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No.6), as
21 the Charterers may direct. If such dock, wharf,or place be not available time to count as provided for in Clause No.5.Vessel on her delivery *shall* to be
22 ready to receive cargo *in I.S.O. containers and/or flat racks with dry and* with clean-swept holds and tight, staunch, strong and in every way fitted for
   *the container liner service, having water ballast, winches and*
23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24 time (and with full complement of officers, *and crew, seamen, engineers and firemen* for a vessel of her tonnage), to be employed, in carrying lawful,
   *harmless merchan-*
25 dise, including petroleum or its products, in proper containers, excluding *see Clause 54*...............................
26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,
27 all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between *safe port and/or ports in British North*
28 *America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or*
29 *Mexico, and/or South America*........................................................................and/or *Europe*
30 and/or *Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between*
31 *October 31st and May 15th, Hudson Bay and all unsafe ports,* also excluding, when out of season, White Sea, Black Sea and the Baltic,
32 *in world wide trading always via safe port(s), safe berth(s), always afloat, always accessible and always within*
33 *Institute Warranty Limits with lawful merchandise in ISO containers only (Charterers present trading intention: Far East/South East*
   *Asia).*.............................................................................................................
34 *See Clause 86*...................................................................................
35 as the Charterers or their Agents shall direct, on the following conditions:
36 1.That the Owners shall provide and pay for all provisions, wages and *immigration* consular shipping and discharging fees of the Crew; shall pay
   for the
37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
38 the vessel in a thoroughly efficient state in hull, machinery and equipment *with all certificates for the vessel and officers/crew necessary to comply with*
   *current regulations at port(s) of call and canals* for and during the service.
39 2. That the Charterers *while the vessel is on hire* shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages,
   *compulsory garbage/sludge fees unless vessel has actually disposed of garbage/sludge in which case for Owners' account, sludge removal to be for*
   *Owners account provided that vessel calls PRC ports and/or Busan on a regular basis during currency of this charter period, otherwise costs to be*
   *mutually shared between Owners and Charterers.* However in case of compulsory port, to be for Charterers account, towages, Agencies, Commissions,
40 Consular Charges (except those pertaining to *individual Crew members but not for usual clearance charge which is considered as part of port*
   *charges, or flag of the vessel*), and all other usual expenses *except* those before stated *in Clause 1*, but when the vessel puts into
41 a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42 illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43 charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
44 of six months or more.
45 Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46 owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47 for dunnage, they making good any damage thereto.
48 3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
49 board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than.......................tons and not more than
50 .......................tons and to be delivered with not less than..............................and not more than..............................tons. *See Clause 37*
51 4.That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 26,000.00 per day or pro rata including overtime*
52 *payable every 15 days in advance.*.........United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and
53 stores on........ ........................summer freeboard, per Calendar Month, commencing on and from the *time of* the day of her delivery, as aforesaid, and at



**SECOND ORIGINAL**

54 and after the same rate for any part of a *day month*; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55 wear and tear excepted, to the Owners (unless, *the vessel lost*) ~~at~~ *on dropping last outbound sea pilot at one(1) safe port Colombo or in Charterers option Port Kelang/Singapore/South Japan range, port in Charterers option, at time day and night*

56 *Sundays Holidays included*, unless otherwise mutually agreed. Charterers are to give Owners not less than *45/30/15/10/5* days *approximate notice of redelivery, followed by 3/2/1 days definite*

57 notice of vessel's ~~expected date~~ of re-delivery, and probable port. *Delivery and redelivery date/time to be based on Shanghai time.*

58 5. Payment of said hire to be made in ~~New York in cash~~ in United States Currency, ~~semi-monthly~~ *every 15 days in advance against Charterers' receipt of Owners' correct original invoices*, and for the last half month or

59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60 due, if so required by Owners, ~~unless bank guarantee or deposit is made by the Charterers~~, otherwise failing the punctual and regular payment of the

61 hire, ~~or bank guarantee,~~ or on any breach of this Charter Party, *subject to Clause 41*, the Owners shall be at liberty to withdraw *any part of the service or the vessel from the service of the Char-*

62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from *the date and hour of valid delivery of the Vessel to Charterers* ~~7 a.m. on the working day~~

63 ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64 ~~to have the privilege of using vessel at once, such time used to count as hire.~~

55 Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, *up to a maximum US$1000. In case higher amount(s) are involved, Charterers to firstly consult Owners* ~~by the Charterers or their Agents~~, subject

66 to 2½ % commission and such advances shall be deducted from the hire *against presentation of vouchers stamped/signed by Master and/or officers. The Charterers, however, shall in no way be responsible for the application*

67 of such advances *(See also Clause 55)*.

68 6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place *or anchorage* that Charterers or their Agents may

69 direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~

70 ~~lie aground.~~

71 7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72 accommodations for Supercargo, if carried, shall be at the Charterer's disposal, reserving only proper and sufficient space for Ship's officers, crew,

73 tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

74 ~~paying Owners..........per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75 ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~

76 8. That the Charterers shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards 'employment and

78 agency; and Charterers are to *perform all cargo handling* ~~load, stow, and trim the cargo~~ *at their expense under the supervision of the Captain, who is to sign the Bills of Lading for*

79 cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *However In Charterers' option, the Charterers or their agents may sign Bills of Lading on behalf of the Captain always in conformity with Mate's or tally/clerk's receipts. All Bills of Lading shall be without prejudice to this Charter and the Charterers shall indemnify the Owners against all consequences or liabilities which may arise from any inconsistency between this Charter and any Bills of Lading or waybills signed by the Charterers or their agents or by the Captain at their request.*

80 9. That if the Charterers *are entitled* ~~shall have~~ reason to be dissatisfied with the conduct of the Captain, Officers, ~~or Engineers,~~ the Owners shall on

81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82 10. That the Charterers *are entitled* ~~shall have~~ permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83 with the utmost despatch*(See also Clause 79.-Supercargo)*. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84 rate of *US$15* ~~$1.00~~ per day for *victualling at Captain's table.* Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85 Clerks, Stevedore's Foreman, etc., Charterers paying ~~at the~~ *for all such victualling, representation and communications at actual costs against representation detailed vouchers* ~~current rate per meal, for all such victualling. *Rate per meal USD 5.00. Charterers to provide Master in writing with their instructions as to any required entertainment/communication/victualling.*

86 11. That the Charterers shall furnish the Captain *or Vessel's command or Owners* prior to commencement of *voyage or* from time to time with all requisite instructions and sailing directions, in writing, *or by Cable/Telex/Fax/Email* and the

87 Captain shall keep a full and correct *deck and engine* Log of the voyage or voyages *in English language,* which are to be patent and *accessible to the* Charterers or their Agents, and furnish the Char-

88 terers, their Agents or Supercargo, when required, with a true *clear and legible* copy of such *deck and engine daily* Logs *in English language,* showing the course of the vessel, *weather conditions, Beaufort scale and sea state,* speed, revolutions of main engine per minute, ~~and~~ distance run and the consumption of fuel *for main engine, generous and/or auxiliary engines.*

89

90 12. That the Captain shall use diligence in caring for the ventilation of the cargo/*container*.

91 13. ~~That the Charterers shall have the option of continuing this charter for a further period of:...........~~

92 ~~........................................................................................................................................................................................~~

93 ~~on giving written notice thereof to the Owners or their Agents:.........days previous to the expiration of the first-named term, or any declared option:~~

94 14. That if required by Charterers, time not to commence before the *agreed opening layday (See Clause 36)*...........and should vessel

95 *not have given written notice of readiness be delivered on or before the agreed cancelling date stipulated in Clause 36, the Owners immediately after having got knowledge of it to inform Charterers in writing about the reasons and the right and true situation of the vessel, giving Charterers proof of same, respectively enabling Charterers to check such situation themselves, in the same message Owners to apply for a reasonable extension of the agreed cancelling date in line with the prevailing circumstances, and Charterers to declare within 2 working days whether they agree to extend the cancelling date accordingly, or whether they elect to cancel the contract.* ~~but not later than 4 p.m. Charterers or~~

96 ~~their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.~~

97 15. That in the event of the loss of time from deficiency *and/or default of and/or strike or stoppage by officers or crew or deficiency* ~~of men~~ or stores, fire, breakdown of or damages to hull, machinery or equipment,



**SECOND ORIGINAL**

98   grounding, detention by average accidents to ship or cargo, *unless resulting from inherent vice, quality or defect of the cargo,* drydocking for the purpose of examination or painting bottom, or by any other cause *unless caused by Charterers or Charterers' agents/servants or any reasons for which Charterers are responsible.*

99   preventing the full working of the vessel, the payment of hire *and overtime if any,* shall cease for the time thereby lost; *All fuels used by the vessel while off-hire shall be for Owners' account* and if upon the voyage the speed be reduced by

100  defect in or breakdown of any part of her hull, machinery or equipment, the time *actually* so lost, and the cost of any extra fuel consumed in consequence

101  thereof, and all extra *proven direct resulting* expenses shall be deducted from the hire.

102  16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106  purpose of saving life and property.

107  ~~17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,~~

108  ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~

109  ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men. (See Clause 51)~~

110  18. That the Owners shall have a lien upon all cargoes, and all sub-freights, *sub-hires* for any amounts due under this Charter, including General Aver-

111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113  might have priority over the title and interest of the owners in the vessel. *(See Clause 104 – BIMCO Non-Lien Provision Clause)*

114  19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

.15  Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of

116  York-Antwerp Rules *1974* ~~1924~~*, and any subsequent latest amendments thereto, in Hong Kong, – hire not to contribute to General Average* ~~at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these~~

117  ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~

118  ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~

119  ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~

120  ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~

121  ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~

122  ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~

123  ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~

124  ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~

125  ~~United States money.~~ *Charterers shall procure that all Bills of Lading issued during the currency of the Charter will contain a provision to the effect that general averages shall be adjusted according to York-Antwerp Rules 1974 including latest subsequent amendments and will include the "New Jason Clause" – as attached to this Charter Party.*

126  ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~

127  ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

128  ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

129  ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~

130  ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

131  ~~ships belonged to strangers.~~

132  ~~Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.~~

133  20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the

134  cost of replacing same, to be allowed by Owners.

135  ~~21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~

136  ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~

137  ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

138  *See Clause 99.*

139  —

140  ~~22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~

141  ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~

142  ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for~~

143  ~~night work, and vessel to give use of electric light when so fitted; but any additional lights over those on board to be at Charterers' expense. The~~

144  ~~Charterers to have the use of any gear on board the vessel.~~ *If required the vessel shall work night and day.*

145  ~~23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;~~

146  ~~steamer to provide one winchman per hatch to work winches day and night, as required; Charterers agreeing to pay officers, engineers, winchmen,~~

147  ~~deck hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~

148  ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~

149  ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~

150  ~~thereby;~~

151  ~~24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~

152  ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~

153  ~~etc.", in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~

154  ~~of which are to be included in all bills of lading issued hereunder:~~

155  U.S.A. Clause Paramount



**SECOND ORIGINAL**

156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
160 ~~Both-to-Blame Collision Clause~~
161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~
167 ~~25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-~~
168 ~~drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the~~
169 ~~port or to get out after having completed loading or discharging.~~ *See Clause 60 - BIMCO Linertime Ice Clause*
170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, *physical control and operation of the vessel and at all times acts of pilots and tug boats,* insurance, crew, and all other matters,
    same as when trading for their own account.
172 27. A commission of *1.25* 2½ per cent is payable by the Vessel and Owners to *Reklub Shipping Limited*.............................................
173 ....................................................................................................................................................................................................
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175 28. An address commission of 2½ per cent payable to..................*Charterers*.................................on the hire earned and paid under this Charter.

*Additional Clauses Number 29 to 115 inclusive and General Average and New Jason Clause, General Clause Paramount and New Both to Blame*
*Collision Clause, as attached hereto, are deemed to be fully incorporated in this Charter Party.*

Charterers: ........................

Conti Cristallo Schiffahrts-GmbH & Co. KG
2/ MS "Conti-Barcelona"
Werner-von-Braun-Str. 10 •
Owners: Tel 0 89 / 45 65 50-0 • Fax 0 89 / 45 65 50-00

This is a computer generated copy of the TIME CHARTER GOVERNMENT FORM (Revised 3rd October, 1946) approved by the New York Produce Exchange (NYPE). Any insertion or deletion to the form must be clearly visible, in the event of any modification made to the preprinted text of this document, and which is not clearly visible, then the original NYPE approved document shall apply. The brokers assume no responsibility for any loss or damage caused as a result of discrepancies between the original NYPE approved document and this document.

SECOND ORIGINAL



REKLUB

## RIDER CLAUSES TO M/V "CONTI BARCELONA"
## SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
## CHARTER PARTY DATED MAY 23RD, 2005

### 29. Inspection / Certificate at Calling Ports

Vessel's equipment shall comply with the regulations of the countries in which Vessel will be employed and Owners are to ensure that Vessel is at all times in possession of valid and up-to-date certificates of efficiency to comply with such regulations.

Owners are obliged to deliver and keep the Vessel, her crew and anything pertaining hereto supplied with up to date and complete certificates and approvals and equipment and fittings, enabling Vessel and her crew to load, carry and discharge all cargoes permitted under this Charter Party, and to receive bunkers within the trading limits of this Charter-Party. For oil pollution certificates, Clause 35 to apply.

If stevedores, longshoremen or other workmen are not permitted to work due to failure of Master and/or Owners and/or Owners' Agents to comply with regulations, or because Vessel is not in possession of such valid and up-to-date certificates of efficiency, then Charterers may suspend hire for the time thereby lost and Owners to pay all proven direct resulting extra expenses incurred incidental to and resulting from such failure.

Vessel to comply with the Safety and Health Regulations and all current requirements at all ports of call during the currency of this Charter and it is the responsibility of the Master and Owners to arrange for required vaccination/s and to keep onboard corresponding certificates.

### 30. Labour Boycott

In the event of loss of time due to blockade or boycott of the Vessel at any port or place arising from terms and conditions on which members of crew are employed, payment of hire shall cease for the time thereby lost, and Owners to pay all direct/proven expenses incurred incidentally due to and resulting from such blockage or boycott. Owners warrant that to their best knowledge the Vessel is not blacklisted by any country within the trading limits of this Charter Party.

### 31. Vessel's Light for Night Work

Vessel to provide and maintain free of expense to Charterers sufficient and efficient light, as on board, to permit simultaneous cargo works at night at all hatches at the same time unless electrical clusters from shore are compulsory in which case same to be for Charterers' account.

### 32. Ballast Voyages

Owners guarantee that Vessel can safely undertake voyages in ballast without carrying solid ballast, but with fuel and water ballast only.

### 33. Fumigation - Cargo Gear - Putting Back - Off Hire Bunkers - Crane Breakdown - Strike/Arrest

a) Fumigation-Deratization



SECOND ORIGINAL



REKLUB

## RIDER CLAUSES TO M/V "CONTI BARCELONA"
## SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
## CHARTER PARTY DATED MAY 23RD, 2005

Vessel to be delivered with valid deratization exemption certificate on board and if such does not cover the whole period on time charter and fumigation and/or deratization is necessary, cost of same and detention to be for Owners' account.

### b) Cargo Gear Certificate

Vessels cargo gear and all other equipment shall comply with the regulations of the countries in which Vessel will be employed and Owners are to ensure that Vessel is at all times in possession of all valid and up-to-date certificates of efficiency to comply with such regulations.

### c) Putting Back/Deviation

If during the currency of this Charter, Vessel should put back while on voyage by reason of an accident or breakdown, or there is any deviation during the course of the voyage or any loss of time caused by sickness of or accident to crew or any person on board Vessel(other than supercargo travelling under Charters auspices) hire shall be suspended from time of her putting back until she is again in the same or, at Charterers discretion, an equidistant position and voyage resumed there from ( in the event of putting back from berth or an anchorage, from time of last line at a discharging berth/anchorage until time of first line at a loading berth/anchorage), or for time actually so lost as the case may be, and cost or extra bunkers consumed and all proven direct resulting extra expenses resulting there from, if any, shall be for Owners' account.

### d) Crane Breakdown - Delete

### e) Strike/Arrest

In the event that Vessel is delayed or rendered inoperative by strikes, labour stoppages or any other difficulties due to Vessel's flag. Ownership, management, registry, officers and crew or lack of their health certificates or trading prior to Vessel's coming on charter including cargoes so carried, such time lost to be considered as off-hire.

Should Vessel be arrested during the currency of this charter at the suit of any person having or purporting to have a claim against or any interest in Vessel, unless resulting from reasons falling under Charterers responsibilities, hire under this charter shall not be payable in respect of any period whilst Vessel remains under arrest or any period during which Charterers are denied full use of the Vessel.

### f) Bunker Consumption During Off-hire

The value of bunkers consumed during any off-hire period under the Charter Party shall be for Owners' account, calculated at current prices with the latest supporting voucher issued by Oil Company.

### 34. P& I Cover/Cargo Claim Handling

Owners guarantee that the Vessel is entered and shall remain entered for the duration of this charter, into



SECOND ORIGINAL



**REKLUB**

<u>RIDER CLAUSES TO M/V "CONTI BARCELONA"</u>
<u>SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.</u>
<u>CHARTER PARTY DATED MAY 23RD, 2005</u>

a P&I Club for full cover in respect of protection and indemnity risks.

Charterers guarantee that they have arranged for and shall continue to have for the duration of this charter, a full cover for time-charter liabilities.

Notwithstanding anything in this Charter Party to the contrary, it is expressly agreed, that the Owners remain responsible for all personal injury to the extent of a full ship Owner P&I cover. Owners to remain fully P&I covered for cargo claims, for which Owners could be made responsible under the terms of the Charter- Party.

Owners however not to be responsible for any loss or damage to cargo stuffed into containers by Shippers and/or Charterers, unless caused by Owners whilst cargo is in care of the Vessel.

Owners P&I Club is: The Swedish Club.

Charterers P&I Club is: China Shipowners Mutual Assurance Association.

Cargo claims to be settled between Charterers and Owners in accordance with the Inter-Club New York Produce Exchange Agreement 1996.

**35. Financial Responsibility In Respect of Pollution**

(Pollution Charter Party Clause issued by INT. Group of P+I Clubs Sept 1996)

1. Owners warrant that throughout the currency of this charter they will provide the Vessel with the following certificates:

a) Deleted

b) Certificates issued pursuant to section 1016(a) of the Oil Pollution Act 1990, and section 108(a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended, in accordance with part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the vessel into the charter), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes)

2. Notwithstanding anything whether printed or typed herein to the contrary:

a) Save as required for compliance with paragraph (1) hereof, Owners' shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.



SECOND ORIGINAL



**REKLUB**

## RIDER CLAUSES TO M/V "CONTI BARCELONA"
## SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
## CHARTER PARTY DATED MAY 23RD, 2005

b) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bill of Lading issued pursuant to this charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

3. Charterers warrant that the terms of this clause will be incorporated effectively into any Bill of Lading issued pursuant to this charter.

### 36. Laycan and Delivery Notices

The Laycan fixed for this Vessel is 11 May/11 July 2005 - 0001/2359 hours local time to be narrowed to a 10-day-spread with Owners 30 days delivery notice and to a 5-day-spread with Owners 15 days delivery notice.

Owners shall keep Charterers closely informed of the present Charterers' redelivery intention and schedule after clean fixture.

Owners to tender 30/15/10/5 days approximate notice of delivery, followed by 3/2/1 days definite notice of delivery.

### 37. Bunkers on Delivery/Re-delivery

Charterers on delivery, and Owners on redelivery, shall take over and pay for all bunkers remaining onboard the Vessel. Bunker quantities on delivery as on board, bunker quantities on redelivery to be about same as quantities of delivery, however both always to be sufficient to reach the nearest main bunkering port.

Owners advise the approximate bunkers quantities as follows:

(REVERTING WITH FIGURES)

Bunker prices on delivery and redelivery as per median Platts Oilgram for each grade at the time and port of delivery and redelivery.

Bunkers costs on delivery to be paid with first hire but always against receipt of the bunker survey report.



SECOND ORIGINAL



**REKLUB**

<u>RIDER CLAUSES TO M/V "CONTI BARCELONA"</u>
<u>SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.</u>
<u>CHARTER PARTY DATED MAY 23RD, 2005</u>

Bunkers costs on re-delivery to be deducted from last sufficient hire payment.

Charterers shall have the option to bunker Vessel for their own account prior to delivery, provided same does not interfere with Owners business. Owners shall have the liberty to bunker Vessel for their account prior to re-delivery, provided not interfering with Charterers operation of the Vessel.

**38. Hold Condition on Delivery - On/Off Hire Survey**

a) Hold condition

Vessel's holds prior to delivery or on arrival at first loadport to be clean, swept, free of infestations, odours and cargo residues and suitable in all respects for the carriage of the maximum described intake of containers and to load any/all permissible cargoes under this charter.

In case cleaning of holds should become necessary during the currency of this charter, due to nature of cargo or cargo operations, such cleaning shall be for Charterers account including removal of residues.

On re-delivery holds to be in about same condition as on delivery, fair wear and tear and rust excepted.

Vessel to deliver with a full set of container lashing/securing units in good working order, sufficient for the maximum described intake of 20 and 40 ft containers on deck/under deck.(see also clause 61)

b) On/off hire surveys

A joint on-hire survey in delivery port, or first port after delivery, and a joint off-hire survey in redelivery port to be held and expenses for same to be shared equally between Owners and Charterers.

On-hire survey to be in Owners' time and off-hire survey in Charterers' time, unless simultaneously with Charterers' operations.

Survey by an independent surveyor acceptable to both parties, to include a statement of the lashing and securing materials on board.

Delivery and redelivery dates/times for purposes of calculating hire to be based on ~~Beijing~~ Shanghai time.

**39. Reporting etc**

During voyages, Master to keep Charterers and/or their Agents informed of Vessel's position and performance in accordance with the instructions received from Charterers. Charterers and their representative, inclusive of supercargo, to have the right to use Vessel's communication facilities. Charterers to reimburse Owners for such communications at actual cost.

**40. Hire Payment**



SECOND ORIGINAL



REKLUB

## RIDER CLAUSES TO M/V "CONTI BARCELONA"
## SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
## CHARTER PARTY DATED MAY 23RD, 2005

Payment of first hire and bunker value: Payment of first hire and value of bunkers onboard on delivery to be paid three(3) banking days after delivery.

Against Charterers' receipt of Owners' correct original invoices, Charterers to remit hire per telegraphic transfer to Owners' following bank account:

| | |
|---|---|
| Bank | : HSH Nordbank AG, Hamburg |
| Acct.No. | : US$ 1180005202 |
| IBAN No. | : DE 94210500001180005202 |
| Beneficiary | : Conti Cristallo Schiffahrts GmbH & Co. KG |
| | MV "Conti Barcelona", Putzbrunn / Germany |

Owners to advance the invoices by email/fax and Charterers to check about the correctness. In case of any mistakes, charterers to notify owners immediately, enabling to correct the invoice in order to avoid any delays in payment.

### 41. Late Receipt of Hire Payments

With reference to clause 5 (five) it is agreed that the hire is to be considered correctly paid upon confirmation of Charterers' bank that money has been remitted irrevocably into Owners' account with value date when hire was due.

If hire has not been paid to Owners in time, Owners to notify Charterers in writing via brokers and also with copy direct to Charterers on Fax: +86-535-6285246 and give them four banking days grace to rectify such failure.

### 42. Deductions From Hire

Charterers shall have the liberty to deduct from last hire payment any amount disbursed for Owners account, off-hire and speed claims, previously agreed by Owners.

Charterers have the further liberty to deduct from last sufficient hire payment, estimated cost of bunkers remaining on board on redelivery, together with a reasonable estimated amount of disbursements for Owners account outstanding, for which vouchers have not yet reached Charterers. Notwithstanding anything stipulated to the contrary in the Charter Party, no deductions other than stipulated in this clause shall be made, unless with the prior written consent of the Owners.

### 43. Loading Instruction

Charterers or their Agents to provide Master with shippers/Agents declared weight of containers, information of containers with special and/or dangerous cargo, requiring special stowage/attentions, as well as total number of containers and destination prior to commencement of loading operation each port. Charterers to be responsible for any damages, delays and expenses as may arise in port or at sea from discrepancy between manifest and actual container weight.

SECOND ORIGINAL



### RIDER CLAUSES TO M/V "CONTI BARCELONA"
### SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO,
### CHARTER PARTY DATED MAY 23RD, 2005

In case any malfunctions of reefer units are found, the Master/crew shall report immediately to Charterers and try for repair/maintenance in accordance with Charterers' instructions, provided spare parts are available for such work and weather permitting. Any spare parts/ time to be for Charterers' account and crew to be considered as Charterer's servants for this task. Owners can not be held responsible for malfunction of reefer containers provided vessel's crew has executed the task as above-mentioned with due diligence. Owners can not be held responsible for malfunction of reefer containers unless resulting from ships failure of supply sufficient electrical power.

**60. Bimco Linertime Ice Clause**

The vessel not to be ordered to nor bound to enter any ice-bound place or any place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival or where there is risk that ordinarily the Vessel will not be able on account of ice to reach the place or to get out after having completed loading or discharging. The Vessel not to be obliged to force ice, nor to follow ice-breakers when inwards bound. If on account of ice the Master considers it dangerous to remain at the loading or discharging place for fear of the Vessel being frozen in and/or damage, he has the liberty to sail to a convenient open place and await the Charterers' fresh instruction. Detention through any of the above causes to be for the Charterers' account.

**61. Owners Lashing Gear**

Owners on delivery to supply the vessel with a full set of container lashing/securing materials/units which to be maintained/reconditioned by the Vessel throughout the charter period at all times for stowing containers up to maximum quantity of 20/40 ft containers, as per Vessel's description.

Charterers are to be responsible for any lashing gear lost or damaged, ordinary wear and tear excepted, Charterers to reimburse Owners for replacing lost/damaged Lashing gear at actual costs.

**62. Errors - Notices Between Parties**

To offset errors, Owners or Charterers to give each other at least 48 hours substantiated written notice before exercising their rights under this Charter Party.

**63. Vessel's Plans**

Owners to make available to Charterers, as soon as practical after fixing main terms, clear and legible English language GA, Capacity, Container stowage plans, lashing plan approved by class, loading scale, hydrostatic curves, tankplan, trim and stability tables, speed and consumption curves, bay plans, and any other plan, tables, instructions book/s, a complete set of copies of all Vessel's certificates together with a color photograph of the Vessel for Charterers' purposes.

**64. Non-Containerized Cargoes**

It is understood that charterers will employ the Vessel in the container trade. Charterers to have the option



SECOND ORIGINAL



REKLUB

**RIDER CLAUSES TO M/V "CONTI BARCELONA"**
**SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.**
**CHARTER PARTY DATED MAY 23RD, 2005**

**44. Breaking I.W.L.**

Subject to Owners' prior and reasonable approval, Charterers have the right to break Institute Warranty Limits. Charterers to reimburse any additional costs including but not limited to extra insurance incurred thereby.

**45. Smuggling**

Owners to be responsible for any consequences including but not limited to any fines/taxes imposed and off-hire time occurred owing to smuggling by Vessel's Master and/or Officers and/or crew and/or their representatives and or their passengers. Charterers to be responsible for consequences including but not limited to any fines/taxes imposed and off-hire time occurred owing to contraband and/or unmanifested drug or goods are found to have been shipped as part of the goods in containers on board.

**46. Deleted**

**47. Renaming and Charterers Colors**

Charterers have the privilege to rename vessel and/or fly their house flag and to paint and mark all outer, over water areas of the vessel, including funnel and paint Charterers' insignia at Vessel's sides in Charterers' colors/standard, at their expenses and time. Charterers to repaint and remark vessel in Owners' colors/standard before redelivery, at Charterers' expense and time. Owners to attend to administrative matters for the applications for both renamings and to present, in due time, respective vouchers supporting expenses incurred.

All expenses in connection with such renaming and for later renaming of the vessel to her old name to be

for Charterers account. Vessel to be renamed to her old name prior or upon redelivery. Any charter name is subject to Vessels registrys approval.

**48. Refund of Insurance Premium**

Charterers to have the benefit of any return insurance premium received by Owners from Underwriters(as and when received from Underwriters) by reason of the Vessel being in port for a minimum period of 30 days provided the Vessel is on hire, and all requirements under the terms of insurance policy for enjoying the insurance premium return are satisfied and paid to Charterers with assistance of Owners.

**Bimco Lay-up Clause**

The Charterers shall have the option of laying up the Vessel for all or any portion (exceeding 30 days) of the Charter period, in which case hire hereunder shall continue to be paid, but there shall be credited against such hire the whole amount which the Owners shall save(or reasonably should save) during such period of lay-up through reduction in expenses, less any extra expenses to which the Owner is put as a result of such lay-up. In case of lay-up Charterers to arrange for docking of the Vessel at their cost prior to Vessel



SECOND ORIGINAL



REKLUB

<u>RIDER CLAUSES TO M/V "CONTI BARCELONA"</u>
<u>SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.</u>
<u>CHARTER PARTY DATED MAY 23RD, 2005</u>

being put-back to service.

### 49. Outbreak of War

In the event of the outbreak of war(whether there be a declaration of war or not) between two or more of the following countries/areas and affecting Vessel's trading: Great Britain, U.S.A., C.I.S., Germany, Peoples Republic of China, Taiwan, Japan, both Owners and Charterers shall have the right of cancelling this Charter Party immediately and Vessel shall proceed to a safe and open port at Charterers option for discharging if required, and the Vessel to be redelivered thereafter.

### 50. Hague Visby Rules/Bimco Hamburg Rules Clause

A reference to the International Convention of the Unification of certain Rules relating to Bills of Lading, dated Brussels, the 25th August 1924 and Hague Rules of as amended by the Protocol signed in Brussels on the 23rd February 1986(the Hague Visby Rules) to be inserted in all Bills of Lading issued hereunder.

New Jason and New Both-To-Blame Collision Clause and Clause Paramount, as applicable to apply and form part of this Charter Party and to be incorporated in all Bills of Lading issued hereunder.

### Bimco Hamburg Rules Clause

Neither the Charterers nor their Agents shall permit the issue of any Bill of Lading, waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the Owners or on the Charterers' behalf or of any sub-Charterers) incorporating where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules. Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

### 51. Arbitration: Bimco Standard Law + Arbitration Clause 1998

This contract shall be governed by and conducted in accordance with English law and any dispute arising out of or in connection with this contract shall be referred to arbitration in Hong Kong in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitration Association (LMAA) Terms current at the time when the arbitration proceeding are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and give notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of



SECOND ORIGINAL



REKLUB

## RIDER CLAUSES TO M/V "CONTI BARCELONA"
## SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
## CHARTER PARTY DATED MAY 23RD, 2005

any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In case where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

### 52. Stevedore Damages

Charterers are not to be responsible for damages to the Vessel unless same are notified in writing by the Master at the time of , or latest within 12 hours of, occurrence of damage, to Charterers or Charterers' Agents or supercargo. Master/Owners shall endeavour to obtain from responsible party acknowledgement of such claim. Hidden damages caused to the Vessel during the currency of this Charter Party to be reported as soon as discovered but latest on redelivery. All stevedore damages affecting Vessel's class, seaworthiness and cargo carrying capability to be repaired immediately on occurrence at Charterers' expenses. Other stevedore damages to be repaired at next drydocking or annual repairs at Charterers' expenses but in any case prior to re-delivery.

### 53. Double Banking

(a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering.

(b) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause to be completed safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

### 54. Dangerous Cargo

Charterers are allowed to load max 750ts IMO cargo, provided packed, labelled, handled, loaded, stowed,



SECOND ORIGINAL



**REKLUB**

## RIDER CLAUSES TO M/V "CONTI BARCELONA"
## SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
## CHARTER PARTY DATED MAY 23RD, 2005

discharged in accordance with IMO and all other international and local regulations.

All extra equipment/fittings/insurance to be arranged and paid for by Charterers.

Prior loading of IMO cargo Master to be furnished in writing with all relevant information like IMO number etc.

The following cargoes always to remain excluded:

Livestock, nuclear and/or radioactive materials/fuels/products/wastes (unless for medical purposes and/or radio isotopes which to be allowed), toxic and/or chemical waste, arms/ammunitions (unless for sports/hunting purposes), explosives (except small quantities of fireworks which to be allowed) asbestos, ferrosilicone, hides, scrap, cargoes banned by United Nations, calcium hypochlorite of any nature.

### 55. Agents

The Charterers agree that their Agents will undertake normal/minor ship's husbandry as Owners' Agents, free of agency fee, Owners only to pay for services actually rendered. This shall not include any extraordinary business such as crew member desertion or being left in hospital, general average, repairs, damage to vessel and similar major items. In such case Owners shall appoint their own Agents or pay Charterers' Agents the relevant agent's fee.

### 56. Slow-Steaming

Charterers shall have the privilege of slow steaming the Vessel at any speed acceptable to Vessels machinery and hull.

### 57. Gangway Watchman

Watchmen for cargo/containers to be for Charterers account. Watchmen for Vessel to be for Owners account unless compulsory, then same to be for Charterers' account.

### 58. Container Clause

Securing of the cargo inside containers and/or other unit load shall be entirely the Charterers' concern and responsibility. Any damage to the Vessel, her tackle, apparel, furniture or anything else resulting from insufficient securing of cargo within containers and/or other unit load shall be repaired at the Charterers' expense and time. Charterers warrant that all containers will be sealed prior to loading.

### 59. Reefer Containers

Vessel to provide electric power as stated by Vessels' description and Master/crew to exercise due diligence in maintaining temperature and other conditions required. Crew to monitor reefer containers twice a day.



SECOND ORIGINAL



**REKLUB**

## RIDER CLAUSES TO M/V "CONTI BARCELONA"
## SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
## CHARTER PARTY DATED MAY 23RD, 2005

to also load lawful general breakbulk allowed for a cellular full-container Vessel, provided complying fully with IMO and other relevant regulations. Any extra insurance and/or any extra expenses and/or loss of time to be for Charterers account. Any deck cargo to be loaded at charterers risk and expenses but always as far as Vessels stability permits. Relative extra insurance to be for Charterers account. In case of deck stowage Bills of Lading to be claused accordingly. (see CL98)

### 65. Dues/Taxes

All dues and taxes on cargo and/or freight/Vessel or levied against Vessel due to her having cargo on board to be for Charterers' account (except income tax levied in the country of the Vessel and/or her Owners domicile which to be for Owners' account).

Any taxes/fees that may be levied on the charter-hire by any country or authority, other than income tax and/or other levies/taxes/fees that are normally payable by Owners in the country of Vessel's/Owners domicile and/or registry or residence, shall not be for Owners account.

### 66. Container Handling Experience

Master, chief officer and cargo officer to have container handling experience.

### 67. Quarantine Time / Expenses etc.

Normal quarantine time and expenses to enter the port to be for Charterers account but any time of detention and expenses for quarantine due to pestilence, illness, etc. Of Master, officer and crew to be for Owners account.

It is the responsibility of the Master and the Owners to arrange for vaccinations required for ports of call/trading area where Vessel is employed and to keep on board corresponding valid certificates.

Any additional quarantine expense or time due to Charterers having traded Vessel to places considered unhealthy and as a result thereof requiring additional quarantine expenses or waiting time or additional vaccination of crew, at subsequent ports of call, shall be for Charterers account.

### 68. Stowaway Clause- Bimco Stowaways Clause

a) (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaway have gained access to the Vessel by means of secreting away in the goods and/ or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and



SECOND ORIGINAL



REXLUB

<u>RIDER CLAUSES TO M/V "CONTI BARCELONA"</u>
<u>SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.</u>
<u>CHARTER PARTY DATED MAY 23RD, 2005</u>

howsoever incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.

(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to sub-clause(a)(ii)above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

(b) (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses what so ever and howsoever incurred, including fines, shall be for the Owners' account and the Vessel shall be off hire.

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by Charterers, the Owners shall take all reasonable steps to secure that within a reasonable time, the vessel is released and at their expense put up bail to secure release of the Vessel.

69. War Clause

The Bimco War Risks Clause for Time Charters, 2004(CONWARTIME 2004) is deemed to be fully incorporated in this Charter Party.

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat Charterers, disponent Owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported:

war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

* Conti Barcelona * / Syms                - 17 -



SECOND ORIGINAL



REKLUB

### RIDER CLAUSES TO M/V "CONTI BARCELONA"
### SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
### CHARTER PARTY DATED MAY 23RD, 2005

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(d) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other



SECOND ORIGINAL



**RIDER CLAUSES TO M/V "CONTI BARCELONA"**
**SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.**
**CHARTER PARTY DATED MAY 23RD, 2005**

sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

**70. Deleted**

**71. Through and House-to-House Containers**

Charterers to keep Owners harmless for any additional expenses and/or damage to containers and/or cargo if through or House-to-House Bills of Lading are signed, if damage/additional expenses occur after actual discharging from or prior to loading on this Vessel.

**72. Option of Premature Termination**

Should the Vessel during the performance of this charter be off-hire for a period of more than forty(40) consecutive days, Charterers have the option to terminate this Charter Party at the place where it occurs and Vessel shall proceed to a safe port at Charterers' option for discharging if required. Vessel can be redelivered only in case Vessel is empty.

Owners shall have no obligation from Bill of Lading issued under the Charter Party when charter is terminated.

During the currency of this Charter Party, the Vessel is to be trading on Charterers' container service and it is imperative that the Vessel has to keep to schedule. Should the Vessel be persistently delayed by engine or essential gear breakdowns and/or other causes affecting her schedule(it being understood that such causes as grounding, collision, or similar cases are excluded) Charterers shall notify Owners who shall take all reasonable steps to rectify problems.

**73. Weather Routing**

Charterers may supply Oceanroutes advice to the Master, during voyages specified by the Charterers. The Master to comply with the reporting procedure of the routing service selected by Charterers, unless Master considers route as not safe.

**74. Inventory of Charterers' Equipment**



SECOND ORIGINAL



**RIDER CLAUSES TO M/V "CONTI BARCELONA"**
**SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.**
**CHARTER PARTY DATED MAY 23RD, 2005**

The Master, as far as possible, to keep a record of all Charterers' gear, equipment and/or stores supplied to the Vessel and to maintain same in good condition. Such gear, equipment, and/or stores to be redelivered to Charterers prior to redelivery of Vessel to Owners or, if requested by Charterers, at any time during the period of the charter, in like good order and condition as supplied (ordinary wear and tear excepted). Owners to make good any shortage and/or damage unaccounted for, unless caused by negligence of Charterers, their servants or Agents.

**75. Deleted**

**76. Container Loading**

Charterers have the option to load in and/or on all hatches empty and/or full containers but in agreement with the Master with reference to the strength of the hatches and the stability of the Vessel and her visibility line. The crew, as far as weather conditions permit, to daily watch the conditions of the containers carried and relash same or tighten the lashings whatever may become necessary during the voyage.

**77. Crew Assistance**

Timecharter hire to include but not to be limited to following works and rendering customary assistance by the crew, provided allowed by local authorities/regulations/unions.

a) To get the vessel always ready for cargo work to avoid wasting time in any case.
b) Deleted
c) Shifting operation and docking/undocking
d) Bunkering
e) Maintaining power while loading and/or discharging
f) Supervision/enabling stevedores to perform the cargo operations
g) Deleted
h) To prepare Vessel's hatches/holds and all lashing/securing materials properly on deck and/or in holds prior to arrival to ports or commencement of operations.
i) To pay due attention to the cargo on board throughout the voyage.
j) Cooling and ventilation instructions for reefer containers to be given in writing by Charterers to the Master prior to loading.

**78. Vessel Inspection**

Charterers to have the option of holding a condition inspection at any time during the currency of this Charter Party with 14 days notification. The Owners and Master giving every facility and assistance to carry out this inspection which to be carried out without interrupting the working of the Vessel and without incurring expenses for the Owners.

**79. Supercargo**

In reference to clause 10 of this Charter Party, the Owners to provide a clean and acceptable room



SECOND ORIGINAL



**RIDER CLAUSES TO M/V "CONTI BARCELONA"**
**SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.**
**CHARTER PARTY DATED MAY 23RD, 2005**

available for the supercargo, furnished to the same standard of other officers' cabins on board the Vessel, having also a writing table available.

The Charterers supercargo/representative to be afforded every courtesy and co-operation of the Vessel's command and to have free and unlimited access to the whole Vessel including bridge, holds and engine rooms, and also to vessel's tanks including but not limited to bunkers, lubrication oil sludge, ballast and freshwater tanks, also to the Vessel's deck and engine logbooks, made during the charter period, tank plans, calibrations scales and/or other plans as requested/required. Supercargo to sign the Letter of Indemnity which shall be in the standard form of Owners' P&I Club.

80. Deleted

81. Deleted

82. Deleted

83. Description of Vessel

## M/V 'CONTI BARCELONA'

GEARLESS CONTAINER VESSEL
CONTAINER INTAKE 1.597 UNITS 20/8/8'6"

STOWAGE HOLD: 618 UNITS
DISTRIBUTION: 100/116/126/128/134/14 - 1ST/2ND/3RD/4TH/5TH/6TH TIER

STOWAGE ON DECK IN FRONT OF BRIDGE: 128 UNITS
DISTRIBUTION: 18/22/22/22/22/22 - 1ST/2ND/3RD/4TH/5TH/6TH TIER

STOWAGE ON HATCHES: 853 UNITS
DISTRIBUTION: 166/186/186/186/129 - 1ST/2ND/3RD/4TH/5TH TIER
INCLUDING 56 UNITS BEING STOWED LATITUDINAL

ALTERNATIVELY
780 UNITS 40/8/8'6" PLUS 28 UNITS 20/8/8'6"
STOWAGE HOLD: 298 UNITS 40' PLUS 22 UNITS 20'
DISTRIBUTION: 46/56/62/62/66/6 - 1ST/2ND/3RD/4TH/5TH/6TH TIER ALL 40'
            8/ 4/ 2/ 4/ 2/2 - 1ST/2ND/3RD/4TH/5TH/6TH TIER ALL 20'

STOWAGE ON DECK IN FRONT OF BRIDGE: 64 UNITS
DISTRIBUTION: 9/11/11/11/11/11 - 1ST/2ND/3RD/4TH/5TH/6TH TIER ALL 40'

STOWAGE ON HATCHES: 418 UNITS 40' + 6 UNITS 20'



SECOND ORIGINAL



**REKLUB**

## RIDER CLAUSES TO M/V "CONTI BARCELONA"
## SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
## CHARTER PARTY DATED MAY 23RD, 2005

DISTRIBUTION: 83/92/92/92/59 - 1ST/2ND/3RD/4TH/5TH TIER - ALL 40'
INCLUDING 28 UNITS 40' STOWED LATITUDINAL
    0/ 2/ 2/ 2/ 0 - 1ST/2ND/3RD/4TH/5TH TIER - ALL 20'

- CONTAINER INTAKES ARE ALWAYS SUBJECT TO VESSEL'S STABILITY/TRIM,
  PERMISSIBLE WEIGHT, STACKWEIGHTS, LASH FORCES, BENDING MOMENTS,
  VISIBILITY LINE AND CARGO SECURING MANUAL

- FITTINGS:
  FULLY FITTED WITH 40' CELLS IN HOLDS (2 X 20' UNITS CAN BE STOWED
  INTO EACH 40' CELL BY USE OF STACKING CONES), FITTED
  WITH NECESSARY LOOSE LASHINGS/FITTINGS TO SECURE 80PCT OF VESSELS
  NOMINAL TEU CAPACITY ON DECK AND 100PCT UNDER DECK.

- 120 REEFER-POINTS (FEMALE) ON DECK
  440 VOLT/3 PHASE/60 CYCLES

- STRENGTH OF DECKS/HATCHES:
  TANKTOP - POINTLOAD: 120T/150T PER 20'/40' STACK
  ON DECK IN FRONT OF BRIDGE - POINTLOAD: 51T/100T PER 20'/40' STACK
  ON HATCHES - HATCHCOVERS 3-8 - P'LOAD: 50T/ 80T PER 20'/40' STACK
    HATCHCOVERS 1-2     40+46/80T PER 20'/40' STACK

- STABILITY:
  STABILITY ACCORDING TO BUILDING YARD BEING GRANTED ACCORDING
  TO S.B.G. REGULATIONS WITH 1.168 TEU OF 14 MT HOMOGENEOUSLY
  LADEN, ALWAYS IRRESPECTIVE OF BUNKERS ON BOARD.

ABT. 23.300 MT DWAT SFB ON ABT. 10.65M
ABT. 16.236/9.475 GT/NT (BRZ/NRZ) (ACCORDING TO LONDON RULES)

CLASS G.L. + 100 A5 E + MC, E 'AUT' 'CONTAINERSHIP'
ENGINE/BRIDGE AFT - MARSHALL ISLANDS FLAG - OWNERS OPTION TO CHANGE
SAME AT ANY TIME - BUILT 1991
ANY COSTS/EXPENSES ON VESSELS FLAG AND AGE TO BE FOR CHRTRS ACCOUNT

ABT. 18.0 KNOTS ON ABT 45.0 MT HEAVY FUEL BASIS DRAFT OF 9,70M
(BASIS EVEN KEEL) BUT EXCL. SHAFTGENERATOR BUT INCL. 1 AUX. ENGINE
(CONSUMING HEAVY FUEL AS WELL AND THE CONSUMPTION IS ALREADY
INCLUDED IN ABOVE MENTIONED 45.0 MTONS)
SPEED/CONSUMPTION FIGURES ARE ON TOWING TANK VALUE AND BASED
ON ISO STANDARD WITH NET CALORIFIC VALUE 42.700 KJ/KG (10.200 KCAL/KG)
AND ISO STANDARDS REFERENCE CONDITIONS (+ 3 0/0 ALLOWANCE)
EXCLUDING SHAFTGENERATOR (400KW) AND EXCL. ANY REEFER UNITS



SECOND ORIGINAL



**REKLUB**

### RIDER CLAUSES TO M/V "CONTI BARCELONA"
### SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
### CHARTER PARTY DATED MAY 23RD, 2005

CARRIED/CONNECTED.
MAIN ENGINE IS ABLE TO BURN UPTO IF 380 CST.

- ALL SPEED/CONSUMPTION ARE BASIS GOOD WEATHER CONDITIONS
  OF MAX BFT 3 OR DOUGLAS SEASTATE 2 AND ON EVEN KEEL, ON CLEAN
  AND SMOOTH BOTTOM, DEEP AND CURRENTLESS WATER WITH MAX TEMP.
  OF 28 DEGR. CELS. AND ENGINE ROOM TEMPERATURE OF MAX. 45 DEG. CELS.

- CHARTERERS SHALL SUPPLY SUITABLE FUELS TO ENABLE MAIN PROPULSION
  AND AUXILIARY MACHINERY TO OPERATE EFFICIENTLY AND WITHOUT
  HARMFUL AFFECTS.
  THE FUEL SUPPLIED TO BE IN ACCORDANCE WITH FOLLOWING
  SPECIFICATIONS:
  ISO 8217: 1996 RMG 35 AND DMB FOR MDO AND/OR LATEST AMENDMENT
  THERETO, IGNITION QUALITY NOT EXCEEDING CCAI850 - and Marpol 73/78
  Annex VI (Reg. 14/18 Fuel Oil Quality)

- MAIN ENGINE DIESEL: BV/MAN B.W., TYPE 6L 60 MC
  DEVOLOP. 9900 KW AT ABT. 111 RPM
  VESSEL HAS ONE EMERGENCY DIESEL AUXILIARY ENGINE BURNING MARINE
  DIESEL OIL

- PORT CONSUMPTION BASIS IDLE: ABT. 1.5 T MDO + 1,0 MT FOR BOILER
  ALWAYS WITH NO REEFER-UNITS CONNECTED

- FITTED WITH SHAFT GENERATOR WHICH TO BE DISENGAGED IF VESSELS
  MAIN ENGINE REVOLUTIONS BELOW 86/FITTED WITH BOW THRUSTER

3 HOLDS / 8 HATCHES
NO. 1   : 12.43 X 20.50/15.60 M
NO. 2   : 12.43 X 20.50 M
NO. 3-8 EACH: 12.43 X 23.03 M - FITTED WITH PONTOON-HATCHCOVERS
                    WITH TRIPLE SECTION EACH

TANK CAPACITIES:
FUEL  - ABT. 1870 T
MDO  - ABT. 180 T
FRESHWATER - ABT. 340 T - FITTED WITH FRESHWATER EVAPORATOR
FITTED WITH ALL MODERN NAUTICAL AIDS/PANAMA-SUEZ CANAL
FITTED/SATELLITE NAVIGATION/WEATHERCHART-RECORDER/INMARSAT-SYSTEM
LOA: 163.48M / LBP: 154.41M / BM: 27.50 M

ABOVE IS ALL ABOUT AND WITHOUT GUARANTEE
27.12.2004



SECOND ORIGINAL



REKLUB

<u>RIDER CLAUSES TO M/V "CONTI BARCELONA"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005</u>

### 84. Captions of Clauses

The caption and headings of clauses herein are inserted for convenience only and shall not be construed to have any restrictive effect on the text herein.

### 85. Strikes Pilots/Tug Boats etc

Owners not to be responsible for any loss of time or other consequences/expenses resulting from any strike of pilots, tug-boats, linesmen, or other shore labour, unless resulting from Vessel's/Owners failure to comply with the terms of the Charter Party or being caused by reason of Owners' side.

### 86. Trading Exclusions

World wide trading always via safe port(s), safe berth(s), safe anchorage(s), always afloat, always accessible and always within Institute Warranty Limits with lawful merchandise in ISO containers only.

Trading exclusions: Angola including Cabinda, Cabinda, Cambodia, Congo, Cuba, Denmark, Ethiopia, Finland, Georgia, Great Lakes, Gulf of Aqaba, Haiti, Iceland, Iran north of Bandar Abbas, Iraq, Israel, Lebanon, Liberia, Libya incl. Gulf of Sidra/Sirte, Nigeria, North Korea, Norway, Russia, Somalia, Sweden, Syria, Turkey, Turkish occupied Cyprus, Yemen, Zaire, war and/or warlike zones and/or countries which result in blacklisting and/or sanctions by the UN. Calling P.R.C. and Taiwan directly (or vice versa) is not allowed unless same is allowed by both authorities. Trading in ice is not allowed.

### 87. Reinsertion In Trading Limits

It is agreed that, from time to time, should the political/trading situation change, the Charterers can ask for reinsertion in trading limits of an excluded country and the Owners can ask for insertion of another excluded country. Both parties agree not to unreasonably withhold their consent, but Owners reserve their rights to maintain trading status as per governing Charter Party terms.

### 88. Deleted

### 89. Deleted

### 90. Liability Insurance

The Charterers shall not be responsible for loss of life nor personal injury nor arrest or seizure or loss or damage to the Vessel and/or other objects arising from perils insured by customary policies of insurance.

### 91. Off-Hire

After suspension of hire, from any cause, the Vessel shall be placed again at Charterers' disposal at the same port, or place, or an equidistant position where hire was suspended.

SECOND ORIGINAL



**RIDER CLAUSES TO M/V "CONTI BARCELONA"**
**SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.**
**CHARTER PARTY DATED MAY 23RD, 2005**

Charterers may, however, in their option accept the Vessel on hire again in such position and at such time as the vessel may again in all respects be ready to comply with the orders and directions of the Charterers.

During any off-hire period estimated to exceed 8 days, the Owners to give the Charterers not less than 3 (three)days definite notice of resumption of the service.

If the Vessel has been off-hire for a total period of 40 (forty) consecutive days during this Charter Party, the Charterers are at liberty to cancel the balance of period of this Charter Party, and redelivery shall take place upon Vessel being free of cargo.

92. War Risk Insurance

The Owners warrant that the Vessel shall remain insured throughout this Charter Party against basic war risks with the insurance company as stated in the description clause at Owners expense.

Any additional war risk insurance premiums for trading to areas declared as additional premium areas by Underwriters to be for Charterers' account.

93. Deleted

94. Deleted

95. Deleted

96. Change of Flag/Registry/Sale of Vessel

The Owners have the option to sell and/or to reflag (flag to be mutually agreed) the vessel during the currency of this charter period, which to be subject to Charterers' prior approval of new Owners and/or new flag, and subject to mutual agreement to the terms and conditions of a Tripartite Agreement which to be signed by Owners, new Owners and Charterers, which not to be unreasonably withheld, Owners have the option to sell the vessel.

It is agreed that such sale of ship and/or change of ownership shall, in no way and/or by no reason, reduce the Charterers' utilization of the vessel. The new Owners, as if they were the original owners, undertake to perform the balance of this Charter Party as per the same terms and conditions as agreed in the Charter Party and any amendments thereto with the original owners.

97. Stowage/Supervision

The Master shall supervise stowage of the cargo as well as instruct one of his officers to supervise all loading, handling and discharge of cargo and it is understood that the stowage plan normally prepared by Charterers, but in which case, vessel/master/chief officer still have the obligation to check, approve and confirm same which shall not be unreasonably withheld.



SECOND ORIGINAL



REKLUB

## RIDER CLAUSES TO M/V "CONTI BARCELONA"
## SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
## CHARTER PARTY DATED MAY 23RD, 2005

### 98. Deck Cargo

The full deck is to be at Charterers disposal for cargo, subject to Vessel's stability, trim, visibility and permissible weights. Any non-containerized cargo shipped on deck to be in Master's discretion, which however not to be unreasonably withheld, and always carried at Charterers Risk, expense and responsibility. The respective Bills of Lading to be claused accordingly.

Owners not to be responsible for damages to or loss of cargoes loaded on deck in open top and/or flat rack containers, if caused by weather and/or seawater influence. The respective Bills of Lading to be claused accordingly.

### 99. Drydocking

Charterers to give owners the opportunity to perform necessary drydocking only when class requires or in case of emergency during the currency of this charter at a convenient time and place, which to be mutually agreed upon between the owners and the charterers. Charterers to release vessel at charterers' berth free of cargo.

The class required drydocking (for special survey) is currently expected as follows (according to owners' information):

|  | last drydocking | next drydocking |
|---|---|---|
| - MV Conti Barcelona | 12 /2003 | 01 / 2006 |

The Owners shall give the Charterers a 3 (three) months prior notice when, where and how long they are intending to drydock the vessel.

The place of dry-docking to be within the trading area or as close as possible.

After drydocking is completed owners shall deliver the vessel to the same berth where the vessel is released or at anchorage if the said berth is occupied.

On commencement of drydocking owners shall advise charterers about expected duration of drydocking and shall tender daily notices of delivery to charterers for resuming the service.

### 100. Deleted

### 101. Registration for Transport of Hazardous Materials

Charterers warrant that they have filed a registration statement with the United States Department of Transportation, Research and Special Programs Administration(RSPA) for certain persons engaged in the offering for transportation and transportation of certain hazardous materials in foreign, intrastate or interstate commerce in accordance with the Hazardous Materials Transportation Uniform Safety Act of 1990(HMTUSA) and will remain so during the duration of this charter. Charterers to be responsible for all permits and registrations for/of hazardous and IMO cargoes necessary to enter and/or trade in and out of

**SECOND ORIGINAL**



## RIDER CLAUSES TO M/V "CONTI BARCELONA"
## SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
## CHARTER PARTY DATED MAY 23RD, 2005

all ports during the currency of this charter and shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including fines) imposed on Owners and/or Vessel due to nonfulfilment of the requirements of the RSPA.

### 102. Insured Risks

Owners to keep the Vessel fully insured against all hull risks as per Institute Time Clauses (hulls) 1.10.1983 including RDC or equivalent conditions and usual deductibles.

### 103. Deleted

### 104. Bimco Non-Lien Provision Clause

Charterers will not suffer nor permit to be continued, any lien or encumbrance incurred by them or their Agents, which might have priority over the title and interest of the Owners in the Vessel.

In no event shall Charterers procure, or permit to be procured, for the Vessel, any supplies, necessaries or services without previously obtaining a statement signed by an authorized representative of the furnisher thereof, acknowledging that such supplies, necessaries or services are being furnished on the credit of Charterers and not on the credit of the Vessel or of her Owners, and that the furnisher claims no maritime lien on the Vessel therefore.

### 105. Oil Spillage

Charterers will not be held responsible for oil pollution or pollution damage caused by the Vessel if the pollution or damage do not arise out of Charterers' acts or due to Charterers' faults.

### 106. Deleted

### 107. Charterers' Servants

Notwithstanding anything else contained in this Charter Party "Charterers' servants" shall always exclude Master, Officers and/or Crew and/or Owners' representatives in this Charter Party unless they are required by Charterers to fulfil Charterers' obligations under this Charter Party.

### 108. Midstream Operations

Cargo operations at midstream/buoys/etc. only allowed in cargo areas where barges can go alongside at vessel's maximum breadth. At no time barges allowed staying under vessels bow- and/or stern-area.

### 109. Bunker Quality Control Clause

1) The charterers shall supply bunkers of a quality suitable for burning in the vessel's engines and auxiliaries and which conform to the specification(s) mutually agreed under this charter in accordance with iso 8217 1996 international standards.

SECOND ORIGINAL



**RIDER CLAUSES TO M/V "CONTI BARCELONA"**
**SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.**
**CHARTER PARTY DATED MAY 23RD, 2005**

2) At the time of delivery of the vessel the owners shall place at the disposal of the charterers, the bunker delivery note(s) and any samples relating to the fuels existing on board.

3) During the currency of the charter the charterers shall ensure that bunker delivery notes are presented to the vessel on the delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the vessel's bunkering manifold and sealed in the presence of competent representatives of the charterers and the vessel.

4) The fuel sample shall be analysed by DNV, of which expenses to be equally shared by Owners and Charterers with supporting vouchers attached.

## 110. BIMCO Fuel Sulphur Content Clause

Notwithstanding anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to meet the maximum sulphur content requirements of any emission control zone when the Vessel is trading within that zone. The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Clause.

For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

## 111. Electrical Power From Shore Clause

The vessel is not AMP fitted.

## 112. ISPS CLAUSE FOR TIME CHARTER PARTIES

(a)(i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company".

Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers.

The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.



SECOND ORIGINAL



**REKLUB**

<u>RIDER CLAUSES TO M/V "CONTI BARCELONA"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005</u>

(b)(i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence.

All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**113. Requisition Clause**

Requisitions: Should the Vessel be requisitioned by any government or governmental authority during the period of this Charter Party, it shall be off hire during the period of such requisition and any hire or other compensation paid by any government or governmental authority in respect of such requisition shall be paid to the Owners. However, the Charterers shall have the option of cancelling the balance period of this Charter Party, provided this option is exercised within 14 days of receipt of notice of requisition.

**114. In case vessel to call the US or Canada, following clauses to apply:**

**U.S. Customs Advance Notification/AMS Clause for Time Charter Parties**

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);
ii) Have in place an ICB (International Carrier Bond);



SECOND ORIGINAL



**REKLUB**

### RIDER CLAUSES TO M/V "CONTI BARCELONA"
### SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
### CHARTER PARTY DATED MAY 23RD, 2005

iii) Provide the Owners with a timely confirmation of i) and ii) above; and
iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

U.S. Security Clause for Time Chartering

If the Vessel calls in the United States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures:

Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence.

US Tax Reform Clause

Any U.S. Gross Transportation Tax as enacted by the United States Public Law 99-514, (also referred to as The U.S. Tax Reform Act of 1986), including later changes or amendments, levied on income attributable to transportation under this charter party which begins or ends in the United States, and which income under the laws of the United States is treated as U.S. source transportation gross income, shall be reimbursed by the Charterers.

US Trade - Unique Bill of Lading Identifier Clause

The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill of Lading Identifier as required by the U.S. Customs Regulations (19 CRF Part 4 Section 4.7.a) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified

SECOND ORIGINAL



REKLUB

**RIDER CLAUSES TO M/V "CONTI BARCELONA"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005**

against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account.

**US Anti Drug Abuse Act 1986 Clause**

(a) In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986, or any re-enactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly.

Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account and the Vessel shall remain on hire. Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense put up bail to secure release of the Vessel.

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the Vessel's personnel.

(b) In pursuance of the provisions of sub-clause (a) above, the Owners and the Charterers warrant that they shall both become signatories to the Sea Carrier Initiative Agreement on signing this Charter Party or on delivery of the Vessel under this Charter, whichever is the earlier, and will so remain during the currency of the Charter.

**C-TPAT Clause**

The Charterers have voluntarily signed the C-TPAT Agreement with the U.S. Customs Service. The Owners, Master and Crew will use reasonable efforts to assist the Charterers to comply with their obligations under the C-TPAT Agreement. However, under no circumstances shall the Owners, Master and Crew be liable for any delays, losses or damages howsoever arising out of any failure to meet the requirements of the C-TPAT Agreement signed by the Charterers.

The Charterers agree to indemnify and hold the Owners, Master and Crew harmless for any claims made against the Owners, Master and Crew or for any delays, losses, damages, expenses or penalties suffered by the Owners arising out of the C-TPAT Agreement signed by the Charterers.

**USA Clause Paramount (if applicable)**



SECOND ORIGINAL



**REXLUB**

### RIDER CLAUSES TO M/V "CONTI BARCELONA"
### SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
### CHARTER PARTY DATED MAY 23RD, 2005

This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16th 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of it's rights or immunities or an increase of any of it's responsibilities or liabilities under said Act. If any terms of this Bill of Lading to be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

**Canada Clause Paramount (if applicable)**

All the terms, provision and conditions of the Canadian Water Carriage of Goods Act 1936, and of the rules comprising the schedule thereto are, so far as applicable, to govern this contract contained in the Bills of Lading issued under this Charter Party and the shipowners are entitled to the benefit of all privileges, rights and immunities contained in such act and in the schedule thereto as if the same were herein specifically set out. If anything herein contained by inconsistent with the said provisions, it shall be to the extent of such inconsistency and so further be null and void.

**115. Off-hire Period**

Charterers have the option to add on the charter period any part of off-hire periods. Once charterers have tendered the first redelivery notice, they have waived this option.

\*\*\*\*\*\*\*\*



**SECOND ORIGINAL**



**REKLUB**

<u>RIDER CLAUSES TO M/V "CONTI BARCELONA"</u>
<u>SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.</u>
<u>CHARTER PARTY DATED MAY 23RD, 2005</u>

**Attachments to this Charter Party**

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to York/Antwerp Rules, 1974 and any subsequent amendments, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply.

### NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery."

And the Charterer shall procure that all Bills of Lading issued under this Charter party shall contain the same clause.

### GENERAL CLAUSE PARAMOUNT

The Bills of Lading shall have effect subject to the provision of any legislation incorporating the rules contained in the international convention for the unification of certain rules relating to Bills of Lading dated Brussels. 25th August 1924 (the Hague rules) or those rules as amended by the protocol signed at Brussels. February 23rd. 1968 (the Hague Visby Rules) and which is compulsorily applicable to the contract of carriage contained herein. If no such legislation is compulsorily applicable, the Hague rules or, if applicable, the Hague Visby Rules as enacted in the country of the port of loading shall apply. When no such enactment is in force in the country of the port of loading the corresponding legislation of the country of the port of discharge shall apply and in the absence of any such legislation, the terms of the 1924 convention as amended by the 1968 protocol shall apply.

Neither the Charterers nor their Agents shall permit the issue of any Bill of Lading, waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the Owners or on the Charterers' behalf or on behalf of any sub Charterers) incorporating the Hamburg Rules or any legislation giving effect to the Hamburg rules or any other legislation imposing liabilities in excess of Hague or Hague Visby Rules. Charterers shall indemnify the owners against any liability, loss or damage which may result from any breach of the fore going provisions of this clause.

SECOND ORIGINAL



RIDER CLAUSES TO M/V "CONTI BARCELONA"
SHANDONG YANTAI INTERNATIONAL MARINE SHIPPING CO.
CHARTER PARTY DATED MAY 23RD, 2005

### NEW BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

### BOTH TO BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owner of the said goods, paid or payable by the other non carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

And the Charterer shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

- End -



Exh. D

**MV CONTI BARCELONA - c/p dd 23.05.2005**

unsettled owners' invoices

| date | inv. no. | amount USD |
|------|----------|-----------:|
| 26.04.2007 | 22/07/01 DNV bunker samples | 1.375,00 |
| 26.04.2007 | 22/07/02 rt/rp/vict. 1-03/07 | 2.381,82 |
| 09.07.2007 | 22/07/03 DNV - bunker samples 04-06/07 | 510,00 |
| 12.07.2007 | 22/07/04 rt/rp/vict. 04-06/07 | 3.859,25 |
| 21.08.2007 | 22/07/05 NoR S 162+161+160+156+157+155+159 | 1.808,90 |
| 07.09.2007 | 22/07/06 Reefer connect 725N+725S+848N+648S+844N+644S+640N+640S | 965,00 |
| 25.09.2007 | 22/07/07 Reefer connect 728N+728S+731N+731S repair 16+31 08/07 | 830,00 |
| 11.10.2007 | 22/07/08 rt/rp/vict. 7-9/07 | 7.796,50 |
| 18.10.2007 | 22/07/09 DNV-bunker samples 07-09/07 | 550,00 |
| 13.11.2007 | 22/07/10 Reefer connect 734S+734N 08-09/07 | 305,00 |
| 19.11.2007 | 22/07/12 Notice of Repair S 165 | 147,50 |
| 19.11.2007 | 22/07/11 Reefer connect 740N+743S 10/07 | 235,00 |
| 12.12.2007 | 22/07/13 Reefer connect 743N+746S 11/07 | 360,00 |
| 08.01.2008 | 22/08/01 Re-charged exp. (Mac Gregor) | 22.208,24 |
| 17.01.2008 | 22/08/02 DNV - bunker samples 10-12/07 | 412,50 |
| 21.01.2008 | 22/08/03 rt/rp/vict. 10-12/07 | 4.485,17 |
| 25.02.2008 | 22/08/04 Reefer connect 746N-803S 12/07+01/08 | 605,00 |
| 18.03.2008 | 22/08/05 Reefer connect 803N+806N 02/08 | 125,00 |
| 15.04.2008 | 22/08/06 rt/rp/vict. 01-03/08 | 4.380,47 |
| 15.04.2008 | 22/08/07 Notice of Repair S 165 + S 166 | 248,00 |
| 25.04.2008 | 22/08/08 DNV - bunker samples 01-03/08 | 687,50 |
| 30.04.2008 | 22/08/09 Reefer connect 809S+809N+812S 03/08 | 280,00 |
| 19.05.2008 | 22/08/10 Notice of Repair S 167 + S 168 | 847,30 |
| 03.06.2008 | 22/08/11 Re-charged expenses (line shifting) | 442,94 |
| 05.06.2008 | 22/08/12 Reefer connect 04 + 814E 05/08 | 670,00 |
| 12.06.2008 | 22/08/13 Reefer connect 813E 05/08 | 360,00 |
| 07.07.2008 | 22/08/14 rt/rp/vict. 04-06/08 | |

|  |  | $56.876,09 |
|------|------|-----------:|
| hire payment | 08.05.08 - 23.05.08 | $380.250,00 |
| hire payment | 23.05.08 - 07.06.08 | $380.250,00 |
| hire payment | 07.06.08 - 22.06.08 | $380.250,00 |
| hire payment | 22.06.08 - 07.07.08 | $380.250,00 |
|  | **total balance due owners** | **$1.577.876,09** |